Argued and submitted May 10, decision of the Court of Appeals affirmed on different grounds; judgment of the circuit court reversed, and case remanded to the circuit court for further proceedings July 21, 1994

PACIFIC FIRST BANK,
a Federal Savings Bank,
by successor in interest Washington Mutual,
a Federal Savings Bank,
*Petitioner on Review,*

*v.*

THE NEW MORGAN PARK CORPORATION,
a Delaware corporation,
*Respondent on Review.*

(CC 9010-06729; CA A71494; SC S40692)

876 P2d 761

Barnes H. Ellis, of Stoel Rives Boley Jones & Grey, Portland, argued the cause for petitioner on review. With him on the petitions were Joyce A. Harpole and Mary K. VanderWeele.

Thomas W. Sondag, of Lane Powell Spears Lubersky, Portland, argued the cause for respondent on review. With him on the responses was James H. Clarke.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

GRABER, J.

Fadeley, J., filed a dissenting opinion.

Unis, J., filed a dissenting opinion in which Fadeley, J., joined.

**GRABER, J.**

This case involves a commercial lease and presents the following questions: (1) Under a lease agreement providing that the tenant "shall not assign, sell, mortgage, pledge or in any manner transfer the Lease or interest herein whether voluntary or involuntary or by operation of law * * * without the prior written consent of the Landlord," was the tenant required to obtain the landlord's consent when the tenant merged into its wholly owned subsidiary? (2) If the tenant was required to obtain the landlord's consent, was the landlord entitled to withhold its consent at its sole discretion, or was it permitted to do so only reasonably, because of a duty of good faith?[1]

We answer those questions as follows: (1) The tenant's merger into its wholly owned subsidiary effected a transfer of the lease "by operation of law," requiring the landlord's consent. (2) A duty of good faith applies to lease agreements; here, however, the landlord's refusal to consent did not contravene that duty, because the landlord's refusal did not contravene the "reasonable expectations" of the parties as manifested in the express terms of the lease agreement at issue.

Pacific First Federal Savings Bank (Tenant) was a tenant in a building owned by The New Morgan Park Corporation (Landlord). Article 18 of the lease agreement between the parties[2] provided in part:

"*ARTICLE 18. ASSIGNMENT, SUBLEASE AND HYPOTHECATION.*

"*Section 18.1 Definitions.* The cumulative (i.e., in one or more sales or transfers by operation of law or otherwise) transfer of an aggregate of 50% or more of the voting stock,

---

[1] In *Tolbert v. First National Bank*, 312 Or 485, 488, 823 P2d 965 (1991), this court stated the general rule that the law imposes "an obligation of good faith in the performance and enforcement of every contract." Similarly, in *Sheets v. Knight*, 308 Or 220, 233, 779 P2d 1000 (1989), this court stated "that the law imposes a duty of good faith and fair dealing in the performance of every contract." For the sake of consistency, in this opinion we will refer to the foregoing "obligation" or "duty" as a "duty of good faith."

[2] The lease agreement was executed in 1982 between Winmar Pacific, Inc., as lessor, and Pacific First Federal Savings & Loan Association, as lessee. Winmar assigned its interest in the lease to Morgan Park in 1986. That assignment created no issue that is pertinent to the present dispute.

including by creation of or issuance of new stock, of the corporation which is Tenant, or of any corporate assignee of Tenant, by which an aggregate of 50% or more of such stock shall be vested in a party or parties who are not stockholders as of the date hereof, shall be deemed an assignment of this Lease. * * * This Section 18.1, however, shall not apply to Pacific First Federal Savings and Loan Association so long as it is the Tenant hereunder.

"*Section 18.2 Assignment etc.* Except as provided in Section 18.3, Tenant shall not assign, sell, mortgage, pledge, or in any manner transfer the Lease or any interest herein whether voluntary or involuntary or by operation of law * * * without the prior written consent of Landlord. If consent is once given by Landlord to assignment * * * of this Lease or any interest therein, Landlord shall not be barred to refuse to consent to any further assignment * * *.

"*Section 18.3 Permitted Subleases.* Landlord will not unreasonably withhold its consent to a sublease to a subtenant in the opinion of Landlord (i) with the financial worth and business background and experience necessary to enable it to perform its obligations under its sublease consistent with this Lease and (ii) whose personal identity and use of the subleased premises shall be compatible with the overall character, use and purposes of the Improvements as a whole as established by Landlord at the time of the sublease."

On July 30, 1990, Tenant notified Landlord that it intended to merge on the following day into Tenant's wholly owned subsidiary, Pacific First Bank (Bank). Tenant asked that Landlord consent to transfer of the lease.[3] Landlord did not consent. The merger proceeded on July 31.

Landlord notified Bank, the post-merger corporate entity, that the merger was an "assignment" without consent constituting a breach of the lease agreement. Bank filed this

---

[3] Tenant sent the following communication to Landlord:

"[Tenant] has entered into an agreement with its indirect, wholly-owned subsidiary, [Bank], pursuant to which [Tenant] will merge with and into [Bank], with [Bank] as the surviving corporation (the 'Merger'). * * *

"* * * * *

"Section 18.2 of the Lease requires that [Tenant] obtain the written consent of [Landlord] prior to any change of control. Accordingly, as counsel to [Tenant] and on its behalf, we have prepared this letter to provide you with notice of the Merger and, by signing in the space provided below and returning this letter to me, to obtain your consent to the Merger."

action seeking a declaration that it became the tenant of the property in compliance with the lease. Landlord counterclaimed to recover possession of the property.

The trial court concluded that "the merger in this case did not require consent of the Landlord." As pertinent here, the trial court reasoned that, like an "upstream" merger,[4] this "downstream" merger[5] resulted only in a change of form, including a change in the name of the post-merger entity, and that there was evidence that the post-merger entity, Bank, was stronger financially than Tenant, its predecessor. The trial court also stated that Section 18.1 of the lease agreement "indicates an understanding on the part of Landlord that Tenant might, during the term of the lease, deem it appropriate to change or alter its structure and/or ownership and that this would not constitute an assignment." The trial court also held that, even if the merger constituted a breach of the agreement, in this case the breach was "technical and immaterial," because Landlord did not show any substantive change in its tenant's financial condition that increased Landlord's risk that it would not receive the benefit of its bargain. The trial court entered a judgment in favor of Bank. Landlord appealed.

The Court of Appeals held that the merger was an "assignment" requiring the consent of Landlord and that failure to obtain that consent was a material breach of the lease agreement. *Pacific First Bank v. New Morgan Park Corp.*, 122 Or App 401, 405, 857 P2d 895 (1993). The Court of Appeals first noted that "the lease did not present an obstacle to an upstream merger" because, in such a merger, Tenant would have continued as the tenant and because Section 18.1 expressly stated that a transfer of 50 percent or more of Tenant's stock to another entity or entities would not constitute an assignment of the lease "so long as [Tenant] is the Tenant [under the lease]." *Id.* at 404. The court concluded, however, that the downstream merger that occurred in this case was "distinguishable," *ibid.*, because, in "transferr[ing]

---

[4] An "upstream" merger occurs when a subsidiary corporation merges into its parent corporation. *See* Henn and Alexander, Laws of Corporations 981 (3d ed 1983) (so stating).

[5] A "downstream" merger occurs when a parent corporation merges into its subsidiary corporation. *See* Henn and Alexander, *supra* note 4 (so stating).

[Tenant's] stock and its interest in the lease" to Bank, Tenant ceased to exist and Bank became Landlord's tenant, *id.* at 405. The Court of Appeals also noted that, although Section 18.3 provides that Landlord "will not unreasonably withhold its consent to a sublease to a subtenant" under certain specified conditions, Section 18.2 places no conditions on the Landlord's right to withhold consent. *Id.* at 406.

The Court of Appeals also referred to this court's statement in *Abrahamson v. Brett*, 143 Or 14, 22, 21 P2d 229 (1933), that,

> "[w]here a subletting or assignment of the leased premises without the consent of [the landlord] is prohibited, [the landlord] may arbitrarily withhold [its consent] without giving any reasons, and in granting [its consent] may impose such conditions as [it] sees fit."

The Court of Appeals concluded that, consistent with this court's quoted statement in *Abrahamson*, Landlord's right to consent to the assignment of the lease was not constrained by a duty of good faith. 122 Or App at 406-07. The court reversed and remanded the case to the circuit court. *Id.* at 408.

Bank sought review in this court, arguing that the merger did not require Landlord's consent, because the quoted statement in *Abrahamson v. Brett, supra,* was merely *dictum*; because, under other decisions of this and other courts, every contract contains a duty of good faith; and because lease provisions relating to consent to assignments carry an implied obligation of reasonableness.[6] We allowed review of Bank's petition and now affirm the decision of the Court of Appeals on different grounds.

In answering the questions presented, we employ general principles of contract construction. Unambiguous contracts must be enforced according to their terms; whether the terms of a contract are ambiguous is, in the first instance, a question of law. *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991). If a contract is ambiguous, the trier of fact will ascertain the intent of the parties and

---

[6] Additional claims of error were argued to the Court of Appeals. Neither party seeks review of the Court of Appeals' disposition of those claims of error, and we do not consider them.

construe the contract consistent with the intent of the parties. *Ibid.*; *see also* ORS 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible). Words or terms of a contract are ambiguous when they reasonably can, in context, be given more than one meaning. *Shadbolt v. Farmers Insur. Exch.*, 275 Or 407, 411, 557 P2d 478 (1976).

■    We first consider whether the lease agreement was ambiguous as to whether, by merging with its wholly owned subsidiary, Tenant "transfer[red]" the lease "in any manner," within the meaning of Section 18.2 of the lease agreement, so as to require Tenant to obtain the consent of Landlord. Section 18.2 does not expressly state whether a merger of Tenant with another corporation effects a "transfer" of the lease for which Tenant must obtain the consent of Landlord. It does, however, expressly provide that a "transfer" of the lease "in any manner," "whether voluntary or involuntary or by operation of law," is an event requiring the consent of Landlord.

■    We conclude that there is no ambiguity on that point in Section 18.2.[7] The terms of Section 18.2 are broad and all-encompassing, including transfers "in any manner." The word "transfer" — even without the extra expansiveness of the phrase "in any manner" — covers all forms of passing of rights and obligations. To "transfer" means "to cause to pass from one person or thing to another"; "to make over * * * the possession or control of"; "CONVEY." Webster's Third New Int'l Dictionary 2426-27 (unabridged ed 1993). *See also* Black's Law Dictionary 1497 (6th ed 1990) ("Transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property"). Section 18.2 expressly includes transfers "by operation of law," and Section 18.1 expressly contemplates that certain transfers of stock are deemed to be assignments of the lease. That being so, Section

---

[7] Even if there were ambiguity on that point in Section 18.2, Tenant's request for consent to the transfer of the lease, quoted in note 3, *supra,* constituted a practical construction of the lease by Tenant, which is entitled to great weight. *See Stark Street Properties v. Teufel*, 277 Or 649, 659-60, 562 P2d 531 (1977) (concluding that the parties' communications regarding the lease in that case "constituted a practical construction of the lease by the parties and is entitled to great weight").

18.2 contemplates that the type of merger that occurred in this case was a "transfer" within the meaning of that section.

Bank argues that the nonassignment clause of the lease agreement (Section 18.2) does not apply, because it does not refer expressly to mergers. More pertinently, however, Section 18.2, which is worded in a broad and all-encompassing manner, does not exclude mergers. A downstream merger is one way in which the rights and obligations under a lease pass — that is, transfer — from one corporate entity to another.

Bank also argues that the nonassignment clause should not apply, because its purpose would not be furthered. Specifically, Bank asserts that it is stronger financially than Tenant, its predecessor. That may be so, but Section 18.2 contains no hint whatever that it applies only to situations involving financially equal or weaker transferees. The plain words of Section 18.2 make the provisions therein applicable to *every* "transfer" of the lease "in any manner," "whether voluntary or involuntary or by operation of law." Only in the situation of a sublease covered by Section 18.3 is the financial condition of an entity made relevant under the terms of the agreement; by implication, in the situations covered by Section 18.2, financial condition is *not* relevant. In addition, the exception provided in Section 18.1 relates to the continued existence of the original tenant as the leasing entity — not the financial condition of that entity. Although there is "meager authority" addressing the effect on a nonassignment clause of mergers by corporate tenants, where such clauses prohibit transfers "by operation of law," such mergers are a breach of the nonassignment clause "if the effect is to transfer the lease to an entity other than that of the original tenant" *even though no interest in property is impaired by the merger.* Milton R. Friedman, 1 Friedman on Leases § 7.303e2 (3d ed 1990). *See also* R. Schoshinski, American Law of Landlord and Tenant § 8.16 (1980 & March 1994 Supp) (if a covenant not to assign a lease expressly prohibits transfers by operation of law, then transfers by operation of law breach the covenant not to assign).

As a result of the merger that occurred in this case, *Tenant ceased to exist* as a corporate entity, and *Bank* — a legally separate corporate entity — succeeded to all the rights

and liabilities of Tenant with respect to the lease. For federal savings banks, *see* 12 CFR § 552.13(b)(6) (providing that a federal savings bank whose corporate existence does not continue after a merger is a "disappearing" association); 12 CFR § 552.13(k) (providing that a charter of a "disappearing" association is deemed to be canceled on the effective date of a merger); 12 CFR § 546.3 (providing in part that, on the effective date of a merger in which the resulting entity is a federal savings bank, the resulting association *"succeeds to"* all the rights and obligations of the merging association (emphasis added)). For state banks, *see* ORS 711.040 (when a bank merger becomes effective, the separate existence of every bank, except the resulting bank, ends; "[a]ll property, all debts, all choses in action and every other interest of each merging * * * bank is *transferred to* and vested in the resulting bank without any further act or deed of any party to the merger" (emphasis added)); *see also* ORS 60.497 (when a merger of corporations takes effect, the separate existence of every corporation except the surviving corporation ceases, and the surviving corporation has all the property and liabilities of each party to the merger). In other words, whichever law relating to the effect of mergers — federal, state, or both — applied here, that law "operated" to give the rights and liabilities of Tenant (one entity) to Bank (another entity), with respect to the lease. Accordingly, the merger of Tenant into its wholly owned subsidiary effected a "transfer" of the lease "by operation of law" that, under the express and unambiguous terms of Section 18.2, required the consent of Landlord.

Bank next argues that, even if the merger of Tenant into its wholly owned subsidiary effected a transfer of the lease requiring the consent of Landlord, Landlord could not withhold that consent unreasonably. Bank contends that, in cases of this court decided after *Abrahamson v. Brett, supra,* this court recognized the principle that *every* contract contains a duty of good faith. *See Best v. U.S. National Bank,* 303 Or 557, 561, 739 P2d 554 (1987) (stating that principle); *Perkins v. Standard Oil Co.,* 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963) (same); *see also* Restatement (Second) of Contracts § 205 (1981) (stating principle).

In *Best v. U.S. National Bank, supra,* this court considered whether a bank's fees for processing certain types of checks were excessive, in violation of the bank's duty of

good faith in the performance of its account agreements with depositors. This court noted that that duty

> "limited the Bank's apparently unlimited authority to set [the challenged] fees, and the [Bank's] depositors [could] recover for the breach of this obligation just as they could for the breach of any other contractual obligation." 303 Or at 561.

This court proceeded to consider the meaning of the term "good faith" in that context. The court discussed the purpose of the good faith doctrine and the definitions of "good faith" proposed in the Restatement (Second) of Contracts § 205. *Id.* at 562-63. The court explained that, in its previous decisions, it

> "has not attempted to set forth a comprehensive definition of good faith. But in line with the Restatement and traditional principles of contract law, [this] court has sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties. When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising the discretion has performed in bad faith." *Id.* at 563 (citations omitted).

The court discussed its previous decisions illustrating the operation of the principle. *Id.* at 563-64. The court noted that, in *Comini v. Union Oil Co.*, 277 Or 753, 756, 562 P2d 175 (1977), it had concluded that, where an oil company had the contractual right to disapprove its distributor's transfer of its distributorship, the company could disapprove a transfer to an inexperienced party. *Best v. U.S. National Bank, supra*, 303 Or at 564. The *Best* court stated, however, that, consistent with the principle, the company could not have disapproved a transfer "in order to retaliate against the distributor for some reason." *Ibid.*

Applying those principles to the case before us, this court concluded in *Best v. U.S. National Bank, supra*, that the bank was obligated to exercise its discretion as to the amount of the fees "within the confines of the expectations of the depositors." *Id.* at 564. When depositors entered into account agreements, they reasonably could have expected

that the challenged fees would be similar in amount to other service fees and would reflect the bank's actual costs in providing the relevant services. *Id.* at 565-66. There was evidence that the bank set the challenged fees at amounts greatly in excess of such reasonably expected amounts, partly in order to "reap the large profits" obtainable from such fees. *Id.* at 566. Thus, a trier of fact could have found that the bank's purposes "were contrary to the reasonable expectations of the depositors when they agreed to pay" the challenged fees. As a result, the court held, the trial court erred in granting summary judgment to the Bank. *Ibid.*

This court later applied those principles to a similar claim by bank depositors in *Tolbert v. First National Bank*, 312 Or 485, 823 P2d 965 (1991). In that case, however, there was undisputed evidence that the depositors agreed to the specific fees charged by the bank and agreed to the right of the bank to change the amount of the fees at its discretion. *Id.* at 490-91. This court concluded:

"The contract in this case * * * granted one party the right to exercise its discretion regarding one aspect of the performance and enforcement of the contract. In changing the amount of the [challenged] fees, [the bank] enforced a right specifically granted to it under the contract. Because the exercise of that right was pursuant to [the bank's] discretion, the good faith obligation discussed in *Best[v. U.S. National Bank, supra,]* applies. Whether any changes in the [challenged] fees were determined in good faith, therefore, should be decided by the *reasonable* contractual expectations of the parties.

"We emphasize that it is only the objectively reasonable expectations of the parties that will be examined in determining whether the obligation of good faith has been met. In the context of this case — when (1) the parties agree to (and their contract provides for) a unilateral exercise of discretion regarding * * * one of the contract terms, and (2) the discretion is exercised after prior notice — we hold as a matter of law that the parties' reasonable expectations have been met." *Id.* at 493-94 (internal quotation marks omitted; citation omitted; footnote omitted; emphasis in original).

This court has emphasized that

"[t]he obligation of good faith does not vary the substantive terms of the bargain * * *, nor does it provide a remedy for an

unpleasantly motivated act that is expressly permitted by contract * * *."

*U.S. National Bank v. Boge*, 311 Or 550, 567, 814 P2d 1082 (1991).

■ We conclude that the principles enunciated in this state's common-law good faith cases are applicable here. That is, we conclude that, as a general proposition, a duty of good faith applies to lease agreements as it does to other contracts. In so holding, we join the jurisdictions referred to by one commentator as a "rapidly growing minority" that recognize this principle. *See* Friedman, *supra*, at § 7.304a (noting that "there is a rapidly growing minority to the effect that if [a] lease states 'tenant may assign only with landlord's consent' or 'tenant may not assign without landlord's consent' there is engrafted on this language by implication the phrase 'which consent shall not be unreasonably withheld' ").

■ We emphasize, however, that the doctrine of good faith is to be applied in a manner that will "effectuate the reasonable contractual expectations of the parties." *See Best v. U.S. National Bank, supra*, 303 Or at 563 (stating that as the purpose of the good faith doctrine); *see also Tolbert v. First National Bank, supra*, 312 Or at 493-94 (where parties' contract provides for unilateral exercise of discretion, reasonable expectations are met when that discretion is exercised after notice); Restatement (Second) of Property § 15.2(2) (1977 & 1993 Supp) ("[a] restraint on alienation without the consent of the landlord of the tenant's interest in the leased property is valid, but the landlord's consent * * * cannot be withheld unreasonably, *unless a freely negotiated provision in the lease gives the landlord an absolute right to withhold consent*" (emphasis added)).

■ In the present case, the reasonable contractual expectations of the parties are shown, by the unambiguous terms of Article 18 of the lease to which the parties agreed, to encompass Landlord's right to withhold consent, at its discretion, to a "transfer" of the lease.[8] Section 18.2 of the lease

---

[8] In its argument, Bank also points to certain provisions of the lease agreement outside Article 18. None of the cited provisions relates in any way to assignments or transfers. Article 18 is a self-contained and complete section of the lease agreement with respect to the topic of assignments and transfers of the lease.

agreement prohibited Tenant from transferring the lease "without the prior written consent of Landlord." Under that provision, the parties expressly agreed to a unilateral, unrestricted exercise of discretion by Landlord. By contrast, Section 18.3 in the same article of the lease agreement provides that "Landlord will not *unreasonably* withhold its consent to a sublease to a tenant" in certain described circumstances. (Emphasis added.) Taken together, those provisions show that the parties freely bargained for, and agreed on, certain conditions related to transfer of the lease and that their bargain did not include other conditions. Considering the terms of all the lease provisions pertaining to transfer, we conclude that Tenant could not have had an objectively reasonable expectation that Landlord's right to grant or withhold consent to the transfer of the lease, provided in Section 18.2, was constrained in the manner suggested by Bank.

Bank asserts that its reasonable expectations also included the law that was applicable at the time the lease agreement was made and that that law itself imposed a duty of good faith. There are two flaws in that reasoning. First, with respect to leases, the applicable law at the time the lease agreement was signed (1982) was stated in *Abrahamson v. Brett, supra,* 143 Or at 22: when a lease prohibits assignment without the landlord's consent, the landlord "may arbitrarily withhold [its consent] without giving any reasons, and in granting [its consent] may impose such conditions as [it] sees fit." As stated above, we are announcing a different principle today: that a duty of good faith applies to lease agreements as it does to other contracts. Second, also as discussed above, the duty of good faith operates *to effectuate the reasonable expectations of the parties* as determined under the terms of their contract. Here, those terms demonstrate that the parties agreed to — that is, reasonably expected — a unilateral, unrestricted exercise of discretion by Landlord under Section 18.2 of the lease agreement.

In summary, Tenant's merger with its wholly owned subsidiary effected a transfer "by operation of law" of the lease, requiring Landlord's consent. Landlord's refusal to consent did not contravene the "reasonable expectations" of the parties as to Landlord's right to withhold that consent, as

those expectations were manifested in the express terms of Article 18 of the lease agreement. Bank is not entitled, therefore, to a declaration that it became the tenant of the property in compliance with the lease agreement.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**FADELEY, J.,** dissenting.

In a decision reminiscent of the actions of the landlord in an 1890's melodrama twirling his moustache while exclaiming "but you must pay the rent," the majority cancels a tenant's rights and forfeits the remaining decades of the term of a 50-year lease. *No default has occurred,* either under the literal terms of the lease or the implied-by-law promise to deal fairly and in good faith. All rent is paid. No diminution of the tenant's assets or financial responsibility has occurred.

The majority seizes on a technicality[1] to forfeit by termination the substantial remaining term of years. That the tenant dispossessed by this imagined technicality is a banking corporation rather than a widow and her orphaned offspring, such as the melodrama's landlord abused, does little to persuade me that the tenant here has violated the lease at all, let alone committed such a violation as to justify termination, forfeiting half or so of the 50-year lease term (including the two automatic 10-year extensions as unequivocally promised).[2]

Merger is *not* a ground for declaring default in the lease. The majority, however, says it is because they believe that the parties expected a "transfer by operation of law," such as would be governmental condemnation of the assets involved, to include mergers even where, as here, the merger enhances the ability of the tenant to pay the promised rent. I

---

[1] And a technicality *of its own* creation at that, not from the lease. In its act of creating the technicality, the court finds facts about the expectation of the parties that are contrary to facts found and entered by the trial court. No discussion of why the factfinder's findings of fact do not control may be located in the majority opinion.

[2] If a contract is breached, damages, not specific performance of some forfeiture provision, is the usual result. Here no damages were suffered. The rent is paid, and will be from the same assets as the landlord had in mind since the inception of the lease.

cannot agree and dissent for that reason as well as for the reasons demonstrated in the dissent of Unis, J., which I join.

**UNIS, J.,** dissenting.

The majority holds that the "downstream" merger[1] of the parent corporation, Pacific Federal Savings Bank, a federally-chartered savings bank (Tenant), into its wholly-owned subsidiary, Pacific First Bank, a federally-chartered savings bank (Bank), triggered the assignment-consent clause (Section 18.2) of the commercial lease agreement, requiring the prior written consent of The New Morgan Park Corporation (Landlord). The majority also holds, paradoxically, that, although the implied duty of good faith and fair dealing requires that a landlord's "consent shall not be unreasonably withheld," 319 Or at 353, in this case, Landlord could nevertheless arbitrarily withhold its consent.

I do not agree that the merger was an event as defined in Section 18.2 that required the consent of Landlord. However, even if the merger was an event as defined in Section 18.2 that required the consent of Landlord, as the majority holds, I conclude that Landlord unreasonably withheld its consent. Consequently, I would hold that the lease continues in full force and effect and that Bank is entitled to a declaration that it is the tenant of the property. Accordingly, I would reverse the decision of the Court of Appeals and affirm the judgment of the trial court.

For its thesis that Tenant's merger into its wholly owned subsidiary (*i.e.*, a "downstream" merger) was an event as defined in Section 18.2 that requires the consent of Landlord, the majority essentially relies on the following. First, Section 18.2, which does not expressly refer to mergers, "does * * * expressly provide that a 'transfer' of the lease 'in any manner,' 'whether voluntary or involuntary or by operation of law,' is an event requiring the consent of Landlord." 319 Or at 348. Second, the word "transfer" "covers all forms of passing of rights and obligations." *Id.* Third, "[a] downstream merger is one way in which the rights and obligations under a lease pass — that is, transfer — from one corporate

---

[1] Merger law distinguishes a "downstream" merger, *i.e.*, a parent corporation merges into its subsidiary, from an "upstream" merger, *i.e.*, a subsidiary merges into its parent corporation. Henn and Alexander, Laws of Corporation 981 (3d ed 1983).

entity to another." 319 Or at 349. Fourth, "whichever law relating to the effect of mergers — federal, state, or both — applied here, that law 'operated' to give the rights and liabilities of Tenant (one entity) to Bank (another entity), with respect to the lease." 319 Or at 350.[2] Finally, "the merger of Tenant into its wholly-owned subsidiary[, Bank,] effected a 'transfer' of the lease 'by operation of law' that, under the express and unambiguous terms of Section 18.2, required the consent of Landlord." *Id.*

On the surface, the majority's reasoning and holding appear to be logical and persuasive. On close scrutiny, however, serious flaws are disclosed. The majority's conception of the effect of the downstream merger and its resulting holding that the merger was an event as defined in Section 18.2 that required the consent of Landlord are not in accordance with statutory law that governs and controls bank mergers. The majority's conception of the effect of the downstream merger also is not in harmony with the objectives of banking laws.

12 CFR § 546.3, which deals with the transfer of assets on merger in which the resulting association is a federal savings bank,[3] provides:

"On the effective date of a merger in which the resulting association is a Federal association, all assets and property of the merging associations[4] shall immediately, *without any further act*, become the property of the resulting association to the same extent as they were the property of the merging associations, and *the resulting association[5] shall be a continuation of the entity* which

---

[2] Without deciding what law governs the merger, the majority simply refers to numerous provisions of federal and state law. *See* 319 Or at 350.

[3] On April 10, 1990, Tenant, Bank, and another federal savings bank affiliate from California executed a "Combination Agreement," in which Tenant and the California affiliate agreed to merge into Bank, with all shares of Tenant's stock to be converted into stock of Bank, the resulting savings bank. That agreement provided, *inter alia*, that the obligations of Tenant, Bank, and the federal savings bank affiliate from California, to effect the merger "shall be subject to the satisfaction" of certain conditions, one of which was the approval by stockholders "[p]ursuant to 12 C.F.R. § 552.13." Section 11.2 of Article XI of that agreement further provided that "[t]his agreement shall be governed by and construed in accordance with federal law."

[4] A "merging association" is "a savings association absorbed by merger." 12 CFR § 546.1(b).

[5] A "resulting association" is defined as "[a]n association whose corporate

absorbed the merging associations. *All rights and obligations of the merging association shall remain unimpaired,* and the resulting association shall, on the effective date of merger, succeed to all those rights and obligations." (Emphasis added.)

Similarly, 12 CFR § 552.13(l) states the effect of a merger on each of the constituent federal savings association's property rights and interests:

"Upon the effective date of merger or consolidation under this section, if the resulting association is a Federal savings association, all assets and property (real, personal, and mixed, tangible and intangible, choses in action, rights and credits) then owned by each constituent association[6] or which would inure to any of them, shall immediately by operation of law and *without any conveyance, transfer, or further action,* become the property of the resulting association. *The resulting association shall be deemed to be a continuation of the entity of each constituent association, the rights and obligations of which shall succeed to such rights and obligations and the duties and liabilities connected therewith.*" (Emphasis added.)[7]

---

existence continues after a merger, or the association resulting from a consolidation of two or more associations." 12 CFR § 552.13(b)(9).

[6] A "constituent association" is the "[r]esulting or disappearing association." 12 CFR § 552.13(b)(4).

[7] To comply with federal law, the terms of Article IV of the "Combination Agreement" between Tenant, Bank, and a federal savings bank affiliate from California provided:

"4.1 Upon the Effective Time of the Initial Merger, all assets and property (real, personal, and mixed, tangible and intangible, choses in action, rights and credits), including existing branches and approved branches that are not yet operating, then owned by Pacific First and PFB/OR, or which would inure to either of them, shall immediately by operation of law and without any conveyance, transfer, or further action, become the property of the resulting association, PFB/OR. PFB/OR shall be deemed to be a continuation of the entity of both Pacific First and PFB/OR and all of the rights and obligations of Pacific First and PFB/OR shall remain unimpaired; and PFB/OR, upon the Effective Time of the Initial Merger, shall succeed to all those rights and obligations and the duties and liabilities connected therewith.

"4.2 Upon the Effective Time of the Merger, all assets and property (real, personal, and mixed, tangible and intangible, choses in action, rights and credits), including existing branches, approved branches that are not yet operating and extraordinary branching rights, then owned by PFB/CA and PFB/OR, or which would inure to either of them, shall immediately by operation of law and *without any conveyance, transfer, or further action,* become the property of the resulting association, PFB/OR. PFB/OR shall be deemed to be a continuation of

The majority states that statutory law, on the effective date of the merger, operated to give Bank, the resulting association, all rights, interests, and obligations of Tenant, the merging association, with respect to the lease. 319 Or at 350. That statement is correct as far as it goes. Federal law also makes it clear that (1) Bank succeeded to *all* of Tenant's rights, interests, and obligations with respect to the lease *without further action,* (2) Bank succeeded to *all* of Tenant's rights, interests, and obligations with respect to the lease *without impairment,* (3) Bank, on the effective date of the merger, is a continuation of the entity of each constituent association (here, Tenant and Bank), and (4) Bank holds and enjoys *all* rights, interests, and obligations *in the same manner and to the same extent* as such rights, interests, and obligations were held or enjoyed by Tenant with respect to the lease.

If Landlord could withhold consent, as the majority holds, then Bank would not receive *unimpaired* all the rights, interests, and obligations that Tenant had enjoyed at the time of the merger, as required by law. Moreover, requiring Tenant to obtain Landlord's consent before Bank succeeds to all of Tenant's rights, interests, and obligations with respect to the lease would be to require "further action," contrary to federal law. The majority's holding that the merger was an event as defined in Section 18.2 that required the consent of Landlord is, therefore, incompatible with federal banking law relating to the merger.

There is another reason why the majority's holding misses the mark. Generally, this court will not enforce a

---

the entity of both PFB/CA and PFB/OR and all of the rights and obligations of PFB/OR and PFB/CA shall remain unimpaired; and PFB/OR, upon the Effective Time of the Merger, shall succeed to all those rights and obligations and the duties and liabilities connected therewith." (Emphasis added.)

ORS 711.040(2), which deals with the effect of mergers of certain banks, similarly provides:

"All property, all debts, all choses in action and every other interest of each merging or converting bank is transferred to and vested in the resulting bank without any further act or deed of any party to the merger or conversion. The title to or any interest in any real estate vested in any merging or converting bank may not revert or be impaired because of the merger or conversion."

*See also* ORS 60.497(b) (when a merger of private corporations takes effect, "[t]he title to all real estate and other property owned by each corporation party to the merger is vested in the surviving corporation without reversion or impairment").

contract that conflicts with a statute where the purpose of the statute is to protect the public. *Mountain Fir Lbr Co. v. EBI Co.*, 296 Or 639, 643-44, 679 P2d 296 (1984). Banking laws are intended to "promote the safety" and "well-being" of banks. *Schramm v. Bank of California*, 143 Or 546, 574, 20 P2d 1093, 23 P2d 327 (1933). In achieving that objective, the paramount consideration is the protection of the interests of depositors and stockholders. 1 Michie on Banks and Banking 15, § 3 (1993). *See also Schramm v. Bank of California, supra*, 143 Or at 574 (objective of promoting safety of banks cannot be achieved unless safety of depositors is the paramount consideration). Here, the legislative objectives of protecting depositors and shareholders that underlie banking laws relating to merger would be frustrated if Landlord could withhold its consent.

For the foregoing reasons, the majority's holding that the "downstream" merger was an event as defined in Section 18.2, requiring the consent of Landlord, is wrong.

Even if the merger was an event as defined in Section 18.2 of the lease that required the consent of Landlord, as the majority holds, the majority misapplies the principles enunciated by this court concerning the implied duty of good faith and fair dealing. I agree with the majority that an implied duty of good faith and fair dealing applies to lease agreements as it does to other contracts. 319 Or at 352. I also agree with the majority that even "if [a] lease states that 'tenant may assign only with the landlord's consent' or 'tenant may not assign without landlord's consent,' there is engrafted on that language by implication the phrase 'which consent shall not be unreasonably withheld.' " 319 Or at 353 (quoting 1 Friedman on Leases § 7.304a (3d ed 1990)). I also agree with the majority that the implied duty of good faith and fair dealing "is to be applied in a manner that will effectuate the reasonable contractual expectations of the parties" and that an objective standard is to be used for determining whether the implied duty of good faith and fair dealing has been met. 319 Or at 353 (internal quotation marks omitted).

Whether Landlord's consent was unreasonably withheld in this case is determined by the objectively reasonable contractual expectations of the parties. *See Tolbert v. First National Bank*, 312 Or 485, 494, 823 P2d 965 (1991) ("it is

only the objectively reasonable expectations of parties that will be examined in determining whether the [implied] obligation of good faith has been met").

My disagreement with the majority is with its method of determining the objectively reasonable expectations of Tenant and Landlord with respect to Section 18.2 of the lease, the assignment-consent clause, and the majority's astounding conclusion that, although Section 18.2, by implication, requires that Landlord's "consent shall not be unreasonably withheld," 319 Or at 353, the objectively reasonable contractual expectations of the parties in this case are met even if Landlord arbitrarily withheld its consent.

To support its conclusion, the majority explains:

"Section 18.2 of the lease agreement prohibited Tenant from transferring the lease 'without the prior written consent of Landlord.' Under that provision, the parties expressly agreed to a unilateral, unrestricted exercise of discretion by Landlord. By contrast, Section 18.3 in the same article of the lease agreement provides that 'Landlord will not *unreasonably* withhold its consent to a sublease to a tenant' in certain described circumstances. (Emphasis added.) Taken together, those provisions show that the parties freely bargained for, and agreed on, certain conditions related to transfer of the lease and that their bargain did not include other conditions. Considering the terms of all the lease provisions pertaining to transfer, we conclude that Tenant could not have had an objectively reasonable expectation that Landlord's right to grant or withhold consent to the transfer of the lease, provided in Section 18.2, was constrained in the manner suggested by Bank.

"* * * * *

"In summary, * * * Landlord's refusal to consent did not contravene the 'reasonable expectations' of the parties as to Landlord's right to withhold that consent, as those expectations were manifested in the express terms of Article 18 of the lease agreement." 319 Or at 353-55.

In *Best v. U.S. National Bank*, 303 Or 557, 563-64, 739 P2d 544 (1987), this court described "good faith and fair dealing" as follows:

"This court * * * has not attempted to set forth a comprehensive definition of good faith. But in line with the Restatement [(Second) Contracts § 205 (1970)] and traditional

principles of contract law, the court has sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties. *See Comini [v. Union Oil Co.]*, 277 Or [753,] 756-57[, 562 P2d 175 (1977)]; *Perkins [v. Standard Oil Co.]*, 235 Or [7,] 15-17[, 383 P2d 107, 383 P2d 1002 (1963)]. *When one party to a contract is given discretion in the performance of some aspect of the contract, the parties ordinarily contemplate that that discretion will be exercised for particular purposes. If the discretion is exercised for purposes not contemplated by the parties, the party exercising discretion has performed in bad faith.* * * *

"To illustrate, in *Comini* the defendant oil company had a contractual right to disapprove the plaintiff distributorship's transfer of the distributorship. This court concluded that the right was intended by the parties to protect the oil company's legitimate business interests in its distribution system. *Comini*, 277 Or at 756. Thus, the oil company could, consistent with its obligation to perform in good faith, reject a transfer to someone inexperienced in the oil business and even reject a transfer to an experienced distributor when it had decided to consolidate the distributorship with another distributorship. *Id.* at 756-57. But the oil company would have performed in bad faith if, for example, it had rejected a transfer in order to retaliate against the distributor for some reason. Similarly, the parties to an employment contract generally contemplate that an employer may use its discretion to fire an at-will employee if the employer is dissatisfied with the employee's performance or if the employee's services are no longer required. The parties do not ordinarily contemplate, however, that the employer may fire the employee in order to deprive the employee of benefits to which the employee would otherwise have become entitled if the employment had continued. An employer who does the later breaches its obligation to perform in good faith. *State ex rel Roberts v. Public Finance Co.*, 294 Or 713, 719 n 4, 662 P2d 330 (1983); *cf. Swanson v. Van Duyn Choc. Shops*, 282 Or 491, 494, 579 P2d 239 (1978)." (Emphasis added.)

Good faith and fair dealing in the performance and enforcement of a contract thus emphasize faithfulness to an agreed common purpose and consistency with the objectively justified expectations of the parties. Restatement (Second) Contracts § 205, *comment a* at 100 (1981). According to *Best*, the "reasonable contemplation" standard of good-faith performance focuses the inquiry on (1) the discretion-exercising party's purpose in exercising that discretion, and (2) whether

that purpose was within the objectively reasonable expectations of the parties.

Instead of following that method of inquiry, the majority focuses its inquiry entirely on the express terms of Article 18 of the lease agreement. 319 Or at 353-55. As a result, the majority holds that the implied duty of good faith and fair dealing requires that a landlord's "consent shall not be unreasonably withheld," and at the same time, paradoxically, also holds that Landlord could arbitrarily withhold its consent.

Applying the method of inquiry stated in *Best* to the facts of this case, whether the discretion exercised by Landlord here in withholding its consent is consistent with the implied duty of good faith and fair dealing depends on the particular purposes reasonably contemplated by the parties in giving Landlord discretion to withhold its consent.

One of those purposes is to protect Landlord from a significant adverse change in the use of the premises or in the ability of Tenant to pay rent. In the words of the Restatement, "[t]he landlord may have an understandable concern about certain personal qualities of a tenant, particularly [its] reputation for meeting [its] obligations. The preservation of the values that go into the personal selection of the tenant justifies upholding a provision in the lease that curtails the right of the tenant to put anyone else in [its] place by transferring [its] interest[.]" Restatement (Second) Property (Landlord and Tenant) § 15.2, *comment a* at 100-01 (1977).[8] Consistent with its obligation to perform in good faith, Landlord could, therefore, refuse to consent to a financially unreliable tenant or to a tenant whose use of the property would lead to waste of Landlord's interests in the property. On the other hand, if Landlord arbitrarily refused to consent, it breached its implied obligation to perform in good faith. *See* Restatement (Second) Property (Landlord and Tenant) § 15.2, *comment a* at 101 (justification for consent provision

---

[8] A modern business lease is predominantly a contract (an exchange of promises) and incidentally a sale of a part of the lessor's interest in the land. *Wright v. Baumann*, 239 Or 410, 413, 398 P2d 119 (1965). Because of the duel nature of a lease as a conveyance of a leasehold and a contract, principles of both contract law and property law are applicable to leases.

"does not go to the point of allowing the landlord to arbitrarily and without reason to refuse to allow the tenant to transfer an interest in the leased property").

A fact-specific analysis is necessary to determine whether, in refusing to consent, Landlord has complied with the implied duty of good faith and fair dealing. Several factors are involved in that analysis, including, but not limited to, (1) the overall financial responsibility of the new tenant, (2) whether the use of the premises would lead to waste of the landlord's interests in the property, (3) the legality of the proposed use, (4) the nature and extent of alterations needed by the proposed new tenant, (5) the proposed new tenant's suitability to use the property, and (6) the expected economic feasibility of the proposed new tenant to meet rent obligations based on the intended use.[9]

Here, the evidence clearly establishes that Bank, the resulting tenant, was, for all practical purposes, the old tenant. The merger here of parent (Tenant) and subsidiary (Bank) did not result in any change in the use of the premises. Bank's ability to fulfill its financial obligations to Landlord under the lease after the merger was not in any way impaired. Management of Tenant became management of the merged parent-subsidiary, Bank. The name and business of both parent and subsidiary and the use of the premises continued unchanged and uninterrupted. In the hearing before the trial court, Tenant's and Landlord's witnesses agreed that there was not a single adverse effect from the merger.

The record in this case, therefore, demonstrates that Landlord arbitrarily refused to consent. That refusal was in bad faith.

For the foregoing reasons, I respectfully dissent.

Fadeley, J., joins in this dissenting opinion.

---

[9] Assignment-consent clauses have particular significance where the rent is based on a percentage of the tenant's sales and an assignment or transfer to a lower volume tenant would reduce the landlord's income. That is not the case here.