Argued and submitted July 27, reversed November 25, 1998, petition for review denied May 25, 1999 (328 Or 594)

MORASCH MEATS, INC.,
an Oregon corporation,
*Respondent,*

*v.*

WESTERN BOXED MEATS DISTRIBUTORS, INC.,
an Oregon corporation, dba Western Pride Carriers;
Western Pride Meats, Inc., an Oregon corporation;
and David H. Allen, Jr.,
*Appellants.*

(9510-07160; CA A96128)

971 P2d 426

Gregory J. Englund argued the cause for appellants. With him on the briefs was Hooper, Englund & Weil, LLP.

Gary Roberts argued the cause for respondent. With him on the brief was Schwabe, Williamson & Wyatt, P. C.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Defendants[1] appeal from a judgment awarding plaintiff damages for the alleged conversion and the loss of use of equipment, tooling and parts after a trial to the court. We reverse.

We state the facts in the light most favorable to plaintiff. *White v. Bello*, 276 Or 931, 933, 556 P2d 1362 (1976). In January 1992, Nord Finance Company (Nord) entered into a lease agreement (the Lane agreement) with Lane Meat Company (Lane) in order to finance equipment for Lane's meat processing business.[2] According to Laurie Bakke, Nord's president, the Lane agreement was actually a security agreement. The collateral for the Lane agreement is listed in an exhibit (Exhibit B) attached to the agreement and includes two grinders, a Formax Patty Machine (F-19) and a spiral freezer. Paragraph 10 of the Lane agreement also provides, in part:

> "All additions, attachments, accessories, and repairs at any time made or placed upon the Equipment shall become part of the Equipment and subject to this Lease, and shall be the property of Lessor."

[1] Defendant Western Boxed Meats Distributors, Inc., is a distributor of refrigerated protein products. Defendant Western Pride Meats, Inc., processes protein products. Defendant David H. Allen, Jr., is the president of the corporations. For purposes of this opinion, we collectively refer to all defendants as Western.

[2] Lane processed its meat in a production line. First, the meat was placed in a hopper where it was forced through a meat grinder. The ground meat then entered a patty machine where augers forced it into a plunger assembly that squeezed the meat through fill slots into moldplates. The air escaped from the moldplates, and a breather system moved the patties forward where the knockout plates removed them. Moldplates are made from various materials and are various sizes and shapes. Moldplates and the accompanying knockout plates and spacers were taken on and off the patty machine depending on the specifications in a customer's order. Then, the patties were placed onto a sheet of paper. Often, the patties proceeded through a cow puncher, a machine with a series of knives that perforated the patties so that they would freeze and cook faster. The patties then proceeded into a freezer. Additional equipment and parts were needed to keep the production line in operation. For example, the meat grinder was sharpened with a plate grinder. Also, because a broken part in any piece of equipment could shut down the entire line, spare parts customarily were kept at the production facility. When a breakdown occurred, the spare part was placed on the machine, and the broken part was repaired for use in the event of a future breakdown.

Nord filed a financing statement to protect its security interest. The financing statement covers the collateral listed in Exhibit B and "all added, substituted or replaced parts and equipment, tools, fittings, furnishings, accessions, accessories, supplies, operating manuals and improvements intended to be used thereon or in connection therewith."

After entering into its agreement with Nord, Lane purchased several pieces of equipment, tooling and parts from a third party that became the subject of the dispute in this case. Those items are not listed in Exhibit B. The equipment included a cow puncher and a plate grinder. The cow puncher was placed approximately one-half to three-quarters of an inch in front of the F-19 in Lane's production line. There was a slight drop from a conveyor belt of the F-19 onto the cow puncher. The cow puncher was able to be moved away from the other pieces of equipment in the line in order to clean it, and it was not integral to the making of all types of patties. The cow puncher was used exclusively with the F-19, except for a couple of times when it was used as a meat tenderizer. Although there is conflicting testimony regarding whether or not the cow puncher was connected to the F-19 via a power cord and whether or not it was in physical contact with the conveyor belt leading to the freezer, we will assume those facts in favor of plaintiff.

The plate grinder was placed in a room separate from the production line. Its purpose was to sharpen the meat grinders listed in Exhibit B. The tooling included mold-plates, knockout plates and spacers used with the F-19 and was added to and removed from the F-19 depending on the specifications in a customer's order. In addition, the tooling that was used in the processing was ordinarily removed at the end of the day for cleaning. The parts consisted of spare parts for the F-19, and they were stored on a rack in an area apart from the production line.[3]

After Lane acquired the above equipment, it entered into a security agreement with Western Boxed Meats Distributors, Inc. (Boxed Meats) and granted to it a security

---

[3] The rack on which the parts were stored is also in issue in this case. For purposes of this opinion, the term "parts" includes the rack.

interest in Lane's "[i]nventory, raw materials, work in progress, accounts, contract rights, general intangibles, equipment, furniture, assets and property of every kind and nature." Boxed Meats filed a financing statement to perfect its security interest in July 1994.

By August 1995, Lane had defaulted on its agreement with Nord. Nord sent a notice of default to Lane. After Lane failed to cure the default, Nord attempted to sell the collateral covered by the Lane agreement. Bakke testified that Boxed Meats, plaintiff and a third party expressed interest in purchasing the collateral listed on Exhibit B, including the F-19. Another representative from Nord went to Lane's premises to tag the collateral covered by its security agreement but tagged only the larger pieces of equipment. He did not tag the items in dispute.

Lane also defaulted on its security agreement with Boxed Meats in August 1995. Thereafter, Lane renounced its rights in the collateral covered by the agreement with Boxed Meats and sold its interest in the collateral to Boxed Meats to satisfy its indebtedness in part. At some point, Boxed Meats was involved in using Lane's equipment on Lane's premises to process meat. Eventually, Nord agreed to sell its collateral covered by the Lane agreement to plaintiff. However, it also agreed to rent its collateral to Boxed Meats from September 1-22, 1995, so that Boxed Meats could finish its processing on Lane's premises. The closing date of the sale to plaintiff was postponed to accommodate Boxed Meats use of the collateral.

Boxed Meats continued to use the collateral though September 26. At some point, Western's employees were instructed by its supervisors to transport any items that they believed Western could use to its own plant. The employees were told not to remove anything listed on Exhibit B, because those items were subject to the Lane agreement. Apparently, Western removed the cow puncher, grinder, tooling and spare parts in issue in this case from Lane's premises during this time. On September 27, 1995, Nord and plaintiff executed a bill of sale. The bill of sale stated, in part:

"Seller [Nord], for itself and its successors and assigns hereby sells, assigns, transfers and sets over unto Buyer [plaintiff] all of the indebtedness of Lane Meat Company,

Inc., due to Seller, all of Seller's right, title and interest in the attached Lease Agreement dated January 13, 1992 * * * and all other documents and instruments entered into or delivered in connection therewith or evidencing the security interest in the Collateral * * *."

Thereafter, plaintiff filed a complaint seeking damages for conversion of the equipment, tooling and parts removed from the Lane facility by Western and for the loss of use of its collateral between September 22 and 27, 1995. Western denied liability, and the case went to trial. Plaintiff's theory at trial was based on the assumption that the Lane agreement covers the items in dispute. It argued that the parties to the Lane agreement intended that the equipment, tooling and parts in issue would be part of Nord's collateral. Western countered by arguing that plaintiff was not entitled to relief because the equipment, tooling and parts are not covered by the Lane agreement and, thus, were not sold by Nord to plaintiff.

During trial, Bakke testified that it was the intent of the parties to the Lane agreement that the equipment, tooling and parts in issue were to be part of the collateral covered by the Lane agreement. Furthermore, she testified that the phrase in the financing statement, "used thereon or in connection therewith," had essentially the same meaning as "placed upon." When Bakke was cross-examined by Western regarding the "placed upon" language in the security agreement, she testified that she did not differentiate between whether or not the items in question were physically attached to the equipment listed in Exhibit B.

In its letter opinion, the trial court held that "the security agreement [Lane agreement] and the financial statement taken separately or taken together were sufficient notice to the defendant and others for the coverage of the additional parts and equipment." It based its holding on "[t]he unrefuted testimony of the Nord representative * * * that the additional equipment was covered both by the security agreement and the financial statement." The court awarded damages of $130,050 for conversion and $5,000 for loss of use as well as prejudgment interest to plaintiff, and judgment was entered accordingly.

On appeal, Western first contends that the trial court erred in denying its motion for judgment of dismissal pursuant to ORCP 54B(2)[4] on the ground that the Lane agreement was unambiguous and did not cover the disputed items as a matter of law. Plaintiff counters that the trial court properly held the Lane agreement to be ambiguous, considered extrinsic evidence of the intent of the parties and resolved the ambiguity in plaintiff's favor. Furthermore, it contends that there is evidence to support the trial court's conclusion that the Lane agreement covered the equipment, tooling and parts in issue.

■■ In *Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995), the Oregon Supreme Court reasoned:

> "When considering a written contractual provision, the court's first inquiry is what the words of the contract say, not what the parties say about it. To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous."

(Citations omitted.) Thus, in interpreting the meaning of a contract, we do not resort to extrinsic evidence, unless the agreement to be construed is ambiguous on its face. *Id.*; *Yogman v. Parrott*, 325 Or 358, 363-64, 937 P2d 1019 (1997). Whether a contractual provision is ambiguous is a question of law. *Eagle Industries*, 321 Or at 405; *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991). A provision is ambiguous "when [it] reasonably can, in context, be given

---

[1] ORCP 54 B(2) provides:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment of dismissal with prejudice against the plaintiff, the court shall make findings as provided in Rule 62."

more than one meaning." *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 348, 876 P2d 761 (1994).

■ The threshold issue is whether the provision in the Lane agreement, "[a]ll additions, attachments, accessories, and repairs at any time made or placed upon the Equipment," is ambiguous. Although the trial court did not expressly indicate that it held the provision to be ambiguous, it must have reached that conclusion in order to have considered the extrinsic evidence of the parties' intent. We give the words of the agreement their common or ordinary meaning. *See Yogman*, 325 Or at 362-63 (reasoning that, because the common or ordinary definitions of terms of a restrictive covenant were susceptible to more than one reasonable interpretation, the terms were ambiguous and the court could properly consider extrinsic evidence of the parties' intent).

Regardless of whether the equipment, tooling and parts are described as additions, attachments, accessories or repairs, the Lane agreement requires that they must be "made or placed upon the Equipment" in order to constitute collateral. "Made" means "specially fitted, designed, or adapted." *Webster's Third New Int'l Dictionary*, 1356 (unabridged ed 1993). "Placed" means "to put into * * * a particular position." *Id.* at 1727. The preposition "upon" means "upward so as to be on." *Id.* at 2517. Taken together in the context of the security agreement, "made or placed upon" means that an item is actually positioned or fitted on a piece of equipment listed in Exhibit B so that it becomes part of it.

In that light, we hold that the Lane agreement is unambiguous and covers the additions, attachments and accessories that were positioned or fitted to the equipment listed in Exhibit B. In context, the language connotes more than a mere physical touching of the equipment in the production line. Rather, the Lane agreement contemplates that the connection between the items listed in Exhibit B and the items in dispute be integral to the functions or use of the collateral to the degree that the items become "part of the equipment." Because the evidence does not show that the cow puncher, the plate grinder, the tooling and the spare parts were "made or placed upon" the equipment in Exhibit B so as

to become part of it, the trial court erred in denying defendants' motion to dismiss under ORCP 54B(2) on the ground that the security agreement did not cover the disputed items.

Because our holding regarding Western's first assignment of error is dispositive, we do not reach its other assignments of error.

Reversed.