Argued and submitted November 8, 1996, decision of the Court of Appeals is reversed in part, otherwise affirmed; judgment of the circuit court reversed in part as to attorney fees and remanded, otherwise affirmed February 13, 1997

Barbara ANDERSON;
John R. Gilbert; Thomas K. Hatfield;
Margaret S. Ivers; Ellen Leigh;
Meadows Land Partnership;
Diane L. Nikkila; Ruth Seibel; Joyce Wineberg;
Judy Delong, as Trustee for the Estate of Sella Hatfield;
and First Independent Bank,
as Trustee for the Estate of William L. Seibel,
*Petitioners on Review,*

*v.*

JENSEN RACING, INC.
(formerly known as Jensen Racing Corporation),
an Oregon corporation;
Donna Jensen; and the New Portland Meadows, Inc.,
an Oregon corporation,
*Respondents on Review.*

(CC 9203-01970; CA A81853; SC S42954)

931 P2d 763

John Paul Graff, of Graff & O'Neil, Portland, argued the cause and filed the briefs for petitioners on review.

William H. Walters, of Miller, Nash, Wiener, Hager & Carlsen, Portland, argued the cause and filed the briefs for respondent on review The New Portland Meadows, Inc.

John R. Faust, Jr., of Schwabe Williamson & Wyatt, Portland, waived appearance for respondents on review Jensen Racing, Inc., and Donna Jensen.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

GRABER, J.

Durham, J., filed a concurring opinion.

## GRABER, J.

Plaintiffs, along with defendant Donna Jensen, are owners of the Portland Meadows Race Track (Portland Meadows). Donna Jensen is the principal in Jensen Racing, Inc. (JRI). JRI operated Portland Meadows from 1984 to 1989 under a 1984 "Fourth Amendment and Restatement of Operating Agreement" (the agreement). In 1991, after an intervening operator's bankruptcy, JRI assigned its interest in the agreement to defendant New Portland Meadows, Inc. (NPM). After various disputes arose, plaintiffs (the track's owners) brought the present action against Jensen, JRI, and NPM (the track's operators), seeking damages for breach of contract, an accounting, and declaratory relief.

As it reaches us, this case presents two issues: (1) Do the payment provisions of paragraph 5 or the payment provisions of paragraph 14 of the agreement apply to parimutuel wagering conducted at Portland Meadows on races conducted live in other locations but "simulcast" to Portland Meadows? (2) Are plaintiffs "the prevailing party" within the meaning of paragraph 17 of the agreement, so that they are entitled to receive attorney fees?[1] We answer those questions as follows: (1) The payment provisions of paragraph 5 apply to parimutuel wagering on the simulcast races. (2) Plaintiffs are "the prevailing party" within the meaning of paragraph 17. We therefore reverse the contrary decision of the Court of Appeals as to those issues. *Anderson v. Jensen Racing, Inc.*, 138 Or App 212, 908 P2d 339 (1995).[2]

---

[1] The trial court and the Court of Appeals considered several other issues as well. Neither party has petitioned this court for review of any of those other issues, however. Thus, we do not consider or disturb the Court of Appeals' holdings as to them. The Court of Appeals' holdings as to the other issues are reflected in the dispositional paragraph at the end of this opinion.

[2] The trial court held that paragraph 5 of the agreement applied to wagering on simulcast races. The Court of Appeals reversed and held that paragraph 14 applied. 138 Or App at 219.

On the issue of attorney fees, the trial court concluded that neither party had prevailed. Therefore, it did not award attorney fees to either party. The Court of Appeals held that the attorney fees issue was "not ripe," 138 Or App at 217, but made rulings with respect to that issue, *id.* at 221, which will be discussed below in the text.

■ Throughout this litigation, plaintiffs have asserted that paragraph 5 of the agreement applies to parimutuel wagering on simulcast races at Portland Meadows. Paragraph 5 provides:

> "*Use Fee*. Operator shall pay to Owners, or their designated agent, each week of the regular racing season for the race meet conducted during that year, a fee for the use of the Race Track Facilities equal to one percent (1%) of the gross parimutuel wagering at the race track. This fee shall be paid weekly on a day to be selected by the parties."

Plaintiffs contend that the simulcast races are part of "the race meet conducted during" each year of the agreement.

Defendants, on the other hand, have asserted that paragraph 14 applies. It states:

> "*Use of Race Track Facilities for Special Purposes*. Operator shall have the right to use the Race Track Facilities for special purposes *other than conducting horse or animal racing* ('Special Purpose'). In such Special Purpose situations, however, the revenues, fees, or income ('Special Income'), if any, received by Operator from such activities or events shall be subject to payment of a Special Purpose fee by Operator to Owners, which shall be determined as follows:

> "14.1. *Horse Related Activities by Anyone*. Operator shall pay to Owners a Special Purpose fee equal to one percent (1%) of the gross Special Income, but not including revenues from concessions, received by Operator for any Special Purpose use of the Race Track Facilities by anyone, including Operator, for all Special Purpose uses that are in anyway 'horse related' (e.g., horse shows, horse sales, etc.).

> "14.2. *Non-Horse-Related Activities by Anyone*. Operator shall pay to Owners a Special Purpose fee equal to five percent (5%) of all the gross Special Income up to $800,000 and three percent (3%) of all the gross Special Income above $800,000, including revenues from concessions, received by Operator for any Special Purpose activities, other than horse-related activities as provided in paragraph 14.1, that are conducted by Operator or any other person on the Race Track Facilities.

"14.3. *Payment of Special Purpose Fees.* All Special Purpose Fees shall be paid with [*sic*] thirty (30) days following the receipt by Operator of the Special Income from the Special Purpose event." (Emphasis in text added.)

Defendants assert that, when JRI offered simulcast races, it was not itself "conducting horse or animal racing" and that paragraph 14, when read with paragraph 5, shows that the coverage of paragraph 5 is limited to "conducting horse or animal racing."

Although they disagree about whether paragraph 5 or paragraph 14 applies to the money generated by simulcast races, the parties agree on four points that bear on the analysis. First, they agree that the simulcast races are a use of the "Race Track Facilities" within the meaning of the agreement. Second, they agree that the money generated from simulcast racing is generated as gross parimutuel wagering, rather than in some other form. Third, they agree that the simulcast races occur only during the annual season when the operator of Portland Meadows is licensed to conduct a "race meet." Fourth, they agree that the contracting parties did not expressly contemplate simulcast racing when they executed the agreement in 1984, and they introduced no extrinsic evidence regarding the contracting parties' actual intention.

"As a general rule the construction of a contract is a question of law for the court." *Hekker v. Sabre Construction Co.*, 265 Or 552, 555, 510 P2d 347 (1973).

"Unambiguous contracts must be enforced according to their terms; whether the terms of a contract are ambiguous is, in the first instance, a question of law." *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 347, 876 P2d 761 (1994) (citation omitted).

Additionally, in deciding whether the terms of a contract are ambiguous and in deciding what those terms mean, the court must consider the context in which they appear. *Id.* at 348, 353-54. *See also Miller v. Miller*, 276 Or 639, 645-48, 555 P2d 1246 (1976) (entire agreement, including recitals, should be considered as a whole); *Strandholm v. Barbey*, 145 Or 427, 441, 26 P2d 46 (1933) ("The courts construe the whole mass of words and not merely some of them."). The court's goal is to

give effect to the intention of the contracting parties. *Investment Service Co. v. Smither*, 276 Or 837, 843, 556 P2d 955 (1976). *See also* ORS 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible).

Applying the foregoing principles, we conclude that paragraph 5 of the 1984 agreement applies to parimutuel wagering on simulcast races at Portland Meadows. Paragraph 5 contains five clauses: "[1] Operator shall pay to Owners, or their designated agent, [2] each week of the regular racing season for the race meet conducted during that year, [3] a fee for the use of the Race Track Facilities [4] equal to one percent (1%) of the gross parimutuel wagering at the race track. [5] This fee shall be paid weekly on a day to be selected by the parties." We shall consider the applicability of each of those clauses in turn.

Clause 1 describes the parties to the payment obligation. There is no dispute that it applies here.

Clause 2 is a self-contained temporal term, describing the overall period of time during which payments must be made. That is, payments must occur "each week of the regular racing season for the race meet conducted during that year." It is only in that temporal context that the term "race meet" appears in paragraph 5. Clause 2, including its use of the term "race meet," does not define the substantive nature of the payments or of the activities that generate the payment obligation, but only the period during which payments are due.

Other portions of the agreement that use the term "race meet" make clear that Clause 2 of paragraph 5 refers to the annual racing season during which the operator is licensed. Paragraph 11 provides:

> "*Possession.* Operator shall have the immediate right to possession of the Race Track Facilities and all personal property located thereon; provided, however, that if Operator shall fail to obtain a race meet license for the 1984 race season, such property shall immediately be returned to Owners."

Paragraph 12 provides:

> "*Oregon Racing Commission Approval.* This Agreement is contingent upon approval by the Oregon Racing Commission of Operator as a race meet licensee, and upon Operator receiving a race meet license suitable for conducting a horse race meet at the Race Track Facilities for the 1984 racing season, and for each subsequent race season thereafter. In the event Operator is unable to obtain a race meet license for the 1984 season, this Agreement shall have no other force and effect. In the event Operator is unable to obtain a race meet license for any racing season subsequent to the 1984 season, this Agreement may be terminated as provided in Section 18. Operator agrees to substantially comply with the terms and conditions of all race meet licenses issued by the Commission (including the conduct of racing on dates specified)."

Those paragraphs require the operator of Portland Meadows to receive "a race meet license" from the Oregon Racing Commission for each annual racing season. As noted, the parties agree that the simulcast races occur only during the annual season when the operator of Portland Meadows is licensed to conduct a "race meet." Accordingly, the condition of clause 2 of paragraph 5 is met.

Clause 3 of paragraph 5 explains substantively what the payment is for: it is a fee for the use of the "Race Track Facilities." Betting on simulcast races by bettors located at Portland Meadows is, by its terms, a use of the Race Track Facilities as defined in paragraph 1 of the agreement. Indeed, the parties agree that presenting simulcast races at Portland Meadows is a use of the Race Track Facilities. Clause 3 applies to simulcast racing.

The next clause of paragraph 5, clause 4, states the amount to be paid: one percent of "gross parimutuel wagering at the race track." By contrast, paragraph 14 of the agreement establishes a different means of payment when the operator receives "revenues, fees, or income" from an activity or event. There is no mention in paragraph 14 of parimutuel wagering. As noted, the parties agree that simulcast racing generates gross parimutuel wagering at the race track but does not generate other forms of revenues, fees, or income. We also note that clause 4 requires that the *gross parimutuel*

*wagering* be "at the race track," but does not similarly require that the *race* be held at Portland Meadows. Because all the conditions therein are met, clause 4 of paragraph 5 applies.

The final sentence of paragraph 5 of the agreement is clause 5. It states a detailed mechanism for the timing of each payment: weekly on a day of the parties' choosing. Clause 5 is consistent with the application of paragraph 5 to simulcast racing.

In conclusion, every part of paragraph 5 of the agreement applies to simulcast racing. Therefore, paragraph 5 controls payment under the agreement for parimutuel wagering generated by simulcast races at Portland Meadows.

■    We turn next to the question of attorney fees. Paragraph 17 of the agreement provides:

> "*Attorney Fees. If suit or action is instituted* in connection with any controversy arising out of this Agreement, *the prevailing party* shall be entitled to recover in addition to costs such sum as the court may adjudge reasonable as attorney fees, including any fees and costs on appeal." (Emphasis in text added.)

Plaintiffs sought various forms of relief in this action, including contract damages, an accounting, and declaratory relief. All claims arose in connection with controversies arising out of the agreement; none was founded on an independent controversy (such as a tort or statutory claim). Plaintiffs failed to prevail on most of their claims although, as the Court of Appeals noted, "there is no question that, ultimately, the *monetary* relief in the case can only run from defendants to plaintiffs and, in some measure, to Jensen." *Anderson*, 138 Or App at 219 (emphasis in original).

Nonetheless, the Court of Appeals concluded that it was not error for the trial court to deny fees to plaintiffs altogether because, "[a]s of now, they have lost more than they have won." *Id.* at 221. That conclusion misreads the term "prevailing party" in the parties' agreement.

By using the definite article "the," the agreement establishes that every "suit or action * * * instituted" will

result in having one, but only one, prevailing party, who "shall be entitled to recover" attorney fees "in addition to costs." The agreement does not define the term "prevailing party." The term "prevailing party" is not a term of common usage, but it has a well-recognized legal meaning in the context of whether to award costs and attorney fees in an action on a contract. ORS 20.096 and 20.097 provide for an award of costs and attorney fees to "the prevailing party" in an action on a contract, in certain circumstances. ORS 20.096(5) defines "prevailing party" for the purpose of ORS 20.096 and 20.097 as "the party in whose favor final judgment or decree is rendered" in the trial court.

This court has stated that, in the absence of evidence that the parties had a different intention, the court will ascribe to the term "prevailing party" (or a similar one) in a contract "the statutory meaning of 'prevailing party,' which is defined in ORS 20.096(5) as 'the party in whose favor final judgment or decree is rendered.'" *Carlson v. Blumenstein*, 293 Or 494, 499-500, 651 P2d 710 (1982) (footnote omitted). In that case, the court made clear that the statutory meaning applies even when the reciprocal provisions of a contract make ORS 20.096 theoretically unnecessary: "We therefore hold that absent any express language in a contract to the contrary, or absent other evidence, the meaning of 'prevailing party' (or similar terms) in contracts such as the contract at bar, be given the meaning contained in ORS 20.096(5)." *Id.* at 500 n 3. The plaintiffs and the defendants each sought damages for breach of contract in *Carlson*, and both succeeded on their respective claims. *Id.* at 496-98. This court held nonetheless that the plaintiffs were "the prevailing party," entitled to obtain fees under the contract, because the contract damages awarded to them exceeded the contract damages awarded to the defendants, so that final judgment for the net amount was entered in the plaintiffs' favor. *Id.* at 501.

As noted, the 1984 agreement contains no wording that would suggest a meaning for the term "prevailing party" that differs from the statutory meaning contained in ORS 20.096(5). There is no evidence in this record that the parties

intended to give any other meaning to that term. Accordingly, we construe the term "prevailing party" in the agreement to mean the party in whose favor final judgment is rendered.[3]

As the Court of Appeals observed, final judgment in this case will be rendered in favor of plaintiffs for some amount. Plaintiffs are, therefore, "the prevailing party" within the meaning of paragraph 17 of the agreement. Under paragraph 17, the prevailing party "shall be entitled to recover" attorney fees in a "reasonable" amount.

The decision of the Court of Appeals is reversed as to the issues of contract interpretation involving "simulcast" races and attorney fees, but is otherwise affirmed. The judgment of the circuit court is reversed as to the issue of attorney fees, and the case is remanded to that court for further proceedings as to attorney fees. The judgment of the circuit court is otherwise affirmed.

**DURHAM, J.,** concurring.

I agree with the majority's disposition and write to comment on the court's discussion of the claim for attorney fees.

Because this is a contract case, the task before the court is to discern the intention of the parties in entering into the following agreement:

> "*Attorney Fees.* If suit or action is instituted in connection with any controversy arising out of this Agreement, the prevailing party shall be entitled to recover in addition to costs such sum as the court may adjudge reasonable as attorney fees, including any fees and costs on appeal."

As the majority states, this court decided in *Carlson v. Blumenstein*, 293 Or 494, 501, 651 P2d 710 (1982), that the court will construe *contractual* terms like "prevailing party"

---

[3] Our opinion in this case is confined to circumstances in which the parties are advancing competing claims under a particular contract. We are not called on in this case to decide who may be entitled to attorney fees when, for example, one party prevails (in the sense used in this opinion) on a contract claim under a contract providing for an award of fees to the prevailing party and the other party prevails on a competing claim of another kind that also carries an entitlement to fees for the prevailing party (*e.g.*, a statutory claim).

and "successful party" to have the *statutory* meaning provided in ORS 20.096(5) (" 'prevailing party' means the party in whose favor final judgment or decree is rendered") unless other contract language or other evidence demonstrates that the parties intended a different meaning. 324 Or at 579. Neither party quarrels with that proposition here, nor do I.

In *Carlson*, this court cautioned that the statutory policy entitling one party to recover an attorney fee simply because the court enters the final judgment in favor of that party "may be an unanticipated result, not contemplated by the framers of the statute." 293 Or at 501 n 4. As this case illustrates, contracting parties who incorporate the concept of "prevailing party," as explained in *Carlson*, into their agreement also may be surprised to realize the consequences of that choice.

Plaintiffs filed several claims and defendants filed no counterclaims, except their request for prevailing party attorney fees. According to the Court of Appeals, plaintiffs lost on most of their claims; defendants successfully defended against more claims than they lost. However, defendants did not obtain affirmative relief. According to *Carlson*, the contract entitles plaintiffs to a prevailing party fee because they obtained a judgment in their favor. The fact that plaintiffs lost more claims than they won is irrelevant to the fact that they "prevailed" in the legal sense.

The choice of contracting parties to award attorney fees to the party that "prevails" in the action seems to work well in cases where the plaintiff's complaint states a single claim, regardless of the variety of forms of relief requested on that claim,[1] and the defendant files no counterclaims. In that

---

[1] This court treats a "claim" as " 'an aggregate of operative facts giving rise to a right or rights * * * which will be enforced by the courts.' " *Peterson v. Temple*, 323 Or 322, 331, 918 P2d 413 (1996) (quoting *Dean v. Exotic Veneers, Inc.*, 271 Or 188, 193, 531 P2d 266 (1975), and *Clark on Code Pleading* 127 (2d ed 1947)) (definition of "cause of action"). Under the modern conception of a claim, a single event giving rise to judicial relief—say, a breach of contract—is one claim and does not become several "claims" because the plaintiff seeks multiple forms of relief (*e.g.*, damages, declaratory relief, and an injunction) on that claim. *See Peterson*, 323 Or at 331 (under *Dean*, "claims for breach of contract and *quantum meruit* recovery arising from the same factual transaction involve the same 'cause of action' ").

circumstance, the policy embodied in ORS 20.096(5) corresponds easily with the parties' contractual intention to award an attorney fee to the party in whose favor the court enters judgment. The same is true if the plaintiff files multiple contract breach claims, the defendant files no counterclaims, and the plaintiff succeeds on all claims or none.

A more complex analysis occurs where each party establishes a right to monetary relief against the other. (I say "complex" rather than "surprising" because *Carlson* was decided in 1982 and drew some attention to these problems.) In that circumstance, the court, applying *Carlson*, offsets the respective recoveries to arrive at a *net* monetary judgment and awards an attorney fee to the party in whose favor the court enters judgment. 324 Or at 579.

Defendants' dissatisfaction here with the court's application of *Carlson* may stem from a misunderstanding of the analysis that the court follows in determining the prevailing party. In deciding which party prevailed in a legal sense, the court does not add up the number of individual claims on which each party prevailed and compare the respective sums. The court does not subtract the number of claims on which a party did not succeed from those on which the party did succeed. The court does not assess, according to some objective or subjective standard, the so-called "importance" to the plaintiff of individual claims or of the action viewed in its entirety, nor does it attempt to evaluate the "importance" to the defendant of a successful defense against one or all claims. The court does not compare and contrast a party's prayer in the complaint for various types or ranges of relief with the relief that that party actually receives in the judgment. Because the court offsets the amounts of the parties' respective damage recoveries, if any, the court does not decide that a party has prevailed in the action solely because that party is entitled to some monetary relief against the other. Some of these issues may be relevant to the determination of a reasonable attorney fee. However, in deciding which party prevailed, the court asks only: In whose favor is the judgment entered?

The complexity of the analysis multiplies where both parties are entitled to some relief, but one party succeeds on

a claim for nonmonetary relief, such as a declaratory judgment, an accounting or other equitable remedy, or a special remedy specified in the contract or a statute. In that circumstance, the attorney fee issue may compel the court to contrast the value, in a general sense, of one party's successful claim for monetary relief against the other party's successful claim for nonmonetary relief. Conceivably, the attorney fee issue may force the court to make such a comparison between each party's successful claims for different forms of nonmonetary relief. Those convoluted inquiries—none of which is presented here—bear the characteristics of a metaphysical attempt to compare the incomparable. When the court somehow resolves those thorny issues, the contract entitles the party in whose favor the court enters judgment to an attorney fee.

I offer no particular solution to problems of this sort. I draw attention to those complexities because contracting parties should realize the profound analytical problems that they can create for courts when they agree only that, in the event of a contractual dispute, the "prevailing party" shall recover attorney fees.

Defendants' arguments suggest that they expect to recover attorney fees because they prevailed on a larger number of individual contractual disputes. The contract here lends some support to that contention because it refers to the institution of suit or action "in connection with *any controversy* arising out of this Agreement." (Emphasis added.) That wording was not present in the contract examined in *Carlson*. However, the majority correctly applies *Carlson* to these facts because the contract entitles the "prevailing party" to a fee regardless of the number of contractual controversies or the parties' relative successes and failures in the action.

Defendants' construct, as I understand it, has some appeal. It would entitle each party to a reasonable attorney fee according to each party's success or failure on each claim or controversy and award a net attorney fee to one party after offsetting the parties' respective attorney fee claims. Under that model, each party, including a party that successfully defended against multiple claims, could assert a contractual right to a reasonable attorney fee for its successes, whether or

not the party also obtained the final judgment in the case. Neither party would be forced to acquiesce in a trial court's oftentimes subjective attempt to take into account the reasonableness of the parties' claims and defenses, and their relative wins and losses on each issue, in deciding what fee is "reasonable."[2] *See* ORS 20.075 (setting forth factors to be considered in awarding attorney fees authorized by statute).

If contracting parties believe that defendants' model for attorney fee awards should control their contractual relationships, they are required, as *Carlson* indicates, to exhibit that intention through express terms in the contract or through other evidence.

I concur.

---

[2] One further drawback of conditioning the contractual right to an attorney fee in part on a trial court's assessment of the reasonableness of the parties' claims and defenses and the magnitude of each party's wins and losses is that the trial court may not find the relevant facts and explain why it reached its conclusion as to those issues. ORCP 68 C(4)(c)(ii) provides in part that "[n]o findings of fact or conclusions of law shall be necessary" in denying or awarding an attorney fee. I commend the numerous trial courts that routinely support their fee awards with appropriate findings of fact and conclusions of law despite the policy embodied in that rule. If a trial court chooses to make no findings of fact or conclusions of law to support its award or denial of fees, the order, for many practical purposes, is insulated from appellate review. Defendants' model obviates that drawback by creating a contractual right to a reasonable fee for success on each claim, notwithstanding the potentially differing views of the parties and the court about the reasonableness of claims or defenses or the importance of specific wins and losses.