Argued and submitted March 2, affirmed on appeal and cross-appeal
September 15, 1999

## Diane Ponti WADSWORTH,
*Respondent - Cross-Appellant,*

*v.*

## WWDM, LTD.,
an Oregon partnership;
Earl Doman, as partner of WWDM; and
Robert L. Withers, as partner of WWDM and
trustee of WWDM Trust,
*Appellants - Cross-Respondents.*

(9502-00848; CA A97080)

986 P2d 1197

Fred B. Miller argued the cause and filed the briefs for appellants - cross-respondents.

S. Ward Greene argued the cause for respondent - cross-appellant. With him on the briefs were M. Elizabeth Duncan and Greene & Markley.

Before De Muniz, Presiding Judge, and Haselton and Kistler, Judges.

KISTLER, J.

**KISTLER, J.**

Plaintiff filed this action to recover on notes that a joint venture[1] issued to two of its partners, who are plaintiff's predecessors in interest. The trial court ultimately entered a declaratory judgment that plaintiff is entitled to recover on the notes without taking into account the deficit in her partnership capital account and awarded her attorney fees. Defendants, the joint venture and its other two partners, appeal. Plaintiff cross-appeals the trial court's refusal to enter judgment on the notes now rather than on liquidation of the joint venture. We affirm on the appeal and the cross-appeal.

Defendant WWDM, LTD., is an Oregon joint venture created in 1979 to invest in land in the Woodburn area. The original partners were David F. Mattson, Homer G. Wadsworth, and defendants Earl Doman and Robert L. Withers.[2] Plaintiff has succeeded to the interests of Mattson and Wadsworth. WWDM purchased the land that was the subject of the joint venture soon after its formation, but it was unable to sell any portion of the land until 1988. WWDM continues to own a 3.25-acre parcel with an appraised value of $564,000; it will realize a substantial profit if it can sell that parcel at or above the appraised value. Up to this time, however, the joint venture has not been profitable; it has survived by expending its capital and by obtaining loans from the partners. The issues in this case revolve around the provisions in the joint venture agreement for dealing with cash shortfalls.

The joint venture agreement requires each partner to contribute $15,000 in initial capital and grants each an initial 25 percent share in the joint venture. Two paragraphs in the joint venture agreement provide that each partner's initial share can change. First, paragraph 3(b) provides that

---

[1] Although WWDM, LTD., is a joint venture, the parties generally refer to it as a partnership. The joint venture agreement itself refers to its members as partners and at times describes the enterprise as a partnership. The distinctions between partnerships and joint ventures are not significant to this case.

[2] Withers has transferred his interest to himself as trustee of the WWDM Trust; the change does not affect our analysis of the case.

each partner will have a capital account and prohibits withdrawing any part of that account. If the capital account becomes "impaired," future profits will go to the partner's capital account, rather than the income account, until the capital account is restored. More significantly, any partner can demand that capital accounts be corrected by cash payments from the partners "and thereafter maintained at all times in the proportions in which the partners share in the profits and losses of the joint venture." If a demand is made and a partner fails to make the cash payment, "then there shall be an automatic re-allocation of the partners' shares in accordance to the capital account of each."

Second, paragraph 4 of the agreement provides that when the joint venture experiences negative cash flow, "each partner shall be assessed in proportion to his respective partnership interes[t]" enough money to fund the deficit. "The contributions shall be in the form of loans, and in no wise deemed to be capital contributions." However, if a partner fails to loan the assessed amount, the remaining partners can reallocate the partnership shares "in accordance to the capital accounts of each *as if* the loans granted were capital contributions." (Emphasis in original.) Thus, there are two ways in which a partner's failure to contribute can affect the partner's share in the joint venture: a partner can either fail to correct a deficiency in the capital account or fail to make loans when required.

After the creation of the joint venture, WWDM incurred a number of obligations that required loans from its members under paragraph 4. The need for cash appears to have been greatest during the nine years before the joint venture began selling its land, but the need continued afterwards. Throughout the period following the formation of the joint venture, the partners' capital accounts underwent a number of adjustments in accordance with the agreement. In the first years, Mattson and Wadsworth made the required loans, but by the mid-1980s each had experienced financial difficulties that ultimately resulted in separate bankruptcy proceedings. Doman and Withers thus became the primary lenders to the joint venture, and the application of paragraphs 3(b) and 4 of the agreement resulted in their gaining almost complete ownership of it.

By the time of the trial, Doman and Withers each owned slightly less than 50 percent of WWDM, while plaintiff, who had acquired the interests of both Wadsworth and Mattson, owned 0.37 percent. Doman and Withers have notes from WWDM that total more than $230,000 each, exclusive of interest, while plaintiff has notes, originally issued to Wadsworth and Mattson, that total slightly less than $70,000, exclusive of interest. All of the partners have negative capital accounts.

Under the terms of the agreement, the joint venture terminated on January 1, 1993, but liquidation will not be complete until after it sells the remaining parcel. The issue in this case is how to distribute the money that will come from that sale. Plaintiff argues that the joint venture should first repay the loans with interest. Defendants agree that the loans to the partners have priority but argue that, as part of repaying the loans, the partners must eliminate the negative capital in their capital accounts. As a result, all partners would receive far less than the full amounts of their loans, leaving much more of the profit from the sale to be distributed in accordance with their partnership shares. Doman and Withers would benefit at the expense of plaintiff, who would receive approximately $13,000 rather than the approximately $79,000 currently owed on her notes.

That disagreement led plaintiff to file this action to recover on the notes. The trial court concluded that she was entitled to recover on the notes without reductions for her negative capital account but that she could not do so until the final liquidation of the joint venture. The trial court then converted the case into a declaratory judgment action and entered a declaration in line with its conclusions.

On appeal, defendants rely on ORS 68.620(1)(b), which provides that, subject to any agreement to the contrary, the assets of a partnership at liquidation include a partner's contributions under ORS 68.310(1). ORS 68.310(1) in turn requires a partner to "contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the share in the profits of the partner." Defendants assume that the contributions described in these statutes include a requirement to restore a negative capital

account at the time of liquidation. Plaintiff appears to accept that assumption but argues that the joint venture agreement establishes an alternative plan of distribution. It follows, she reasons, that the joint venture agreement controls, not the terms of the statute.[3] Plaintiff relies on paragraph 15 of the agreement, which provides an order for distributing the proceeds of liquidation. Under paragraph 15, the proceeds will go first to debts or liabilities of the joint venture, other than those owed to partners; second, to establishing certain reserves; third, to repaying loans or advances made by the parties to the joint venture; and, fourth, to the parties to the joint venture in accordance with their interests in it.

■ Paragraph 15 does not expressly excuse the partners from restoring their negative capital accounts. However, we agree with the trial court that the agreement as a whole is ambiguous in that respect. The distribution provisions of paragraph 15 are different from those under ORS 68.620(2), suggesting that the parties intended that that paragraph would supersede the statutory distribution provisions, including the requirement of restoring negative capital. In addition, and possibly of greater weight, paragraph 3(b) of the agreement expressly provides that partners who fail to maintain their capital accounts may lose a proportionate interest in the partnership. That appears to be a complete statement of the consequences for that failure. Once a partner has lost part of his or her interest in the joint venture under that provision, there is no obvious reason to continue to require the partner to restore the negative capital accounts. The partner has already suffered the agreed consequences of the failure to do so. It appears likely from the words of the joint venture agreement that the parties intended the joint venture agreement to supersede any statutory requirement to restore negative capital. At the least, the agreement is ambiguous on that point.

■ The trial court, after determining that the agreement was ambiguous, found that the parties did not intend the loans to be subject to recoupment for negative balances in

---

[3] ORS 68.620(1) provides that the partners may agree to vary the statutory rules for distribution set out in that section.

the partners' capital accounts. There was evidence in the record, including a statement from defendants' attorney that the capital accounts would never become negative, to support the trial court's conclusions, and we are therefore bound by them.[4]

Defendants argue that a Texas decision, *Park Cities Corp. v. Byrd*, 534 SW2d 668 (Tex 1976), compels a different result. In that case, the limited partner of a limited partnership that was in the process of liquidation sought to require the general partner's estate to repay the general partner's negative capital balance before the estate received repayment for loans the general partner had made. The partnership agreement provided that the general partner would bear all partnership losses. Although the general partner was required to contribute her financial resources, skill, efforts, and abilities, and the limited partner was required to contribute only $100, the agreement provided that distributions of partnership assets would be divided equally between the general partner and the limited partner. The deficit in the general partner's capital account came from the allocation of the partnership's accelerated depreciation to her, an allocation that had allowed her to take substantial tax losses during the life of the partnership.

The Texas Supreme Court concluded that the parties did not intend that the general partner would receive tax benefits from the partnership losses without being ultimately responsible to the partnership for those amounts. It pointed out that, were it not for the agreement that the general partner would be responsible for all losses, the limited partner would have received some of those tax benefits for its own use. The court concluded that the agreement expressly required the general partner to bear the losses; it also concluded that depreciation, whether or not it was a real economic loss to the partnership, was one of the categories of loss that the general partner had to bear. It therefore held that

---

[1] Declaratory judgment proceedings seeking the construction of a contract are legal in nature, and the factual determinations of the trier of fact are binding on appeal if there is evidence to support them. *C & B Livestock v. Johns*, 273 Or 6, 10, 539 P2d 645 (1975); *Salem Resources v. U.S. Consultants*, 75 Or App 249, 251-52, 706 P2d 970 (1985).

the partnership could recover the losses previously distributed to the general partner. 534 SW2d at 674-75.

Among the differences between *Park Cities Corp.* and this case are that only one partner in *Park Cities Corp.* was responsible for losses and that the partnership agreement did not provide any consequences for a partner whose capital account became impaired. In contrast, in this case all partners were responsible for the joint venture's losses and, apparently, received tax benefits from those losses. More significantly, paragraph 3(b) of the agreement provides a specific consequence for a partner who fails to restore impaired capital: the partner will lose part of his or her interest in the joint venture. The agreement in *Park Cities Corp.* had no comparable provision.[5] Although defendants read *Park Cities Corp.* as if it stated a generally applicable principle of law, the Texas Supreme Court based its conclusion on the express terms of the limited partnership agreement in that case. The trial court could properly conclude that the parties in this case reached a different agreement. We accordingly affirm the trial court's declaration that the partners' loans were not subject to recoupment for the negative balances in their capital accounts.

■ ■ Defendants also challenge the trial court's ruling awarding plaintiff her attorney fees. They argue primarily that the court erred in designating plaintiff as the prevailing party. Plaintiff, however, prevailed in substantial part on her claim on the notes and prevailed completely on defendants' first counterclaim.[6] The trial court decided that plaintiff was entitled to recover on the notes and that WWDM may not deduct her negative capital balances from the amount that it

---

[5] Paragraph 3(b) of the agreement in this case could have a major impact on what a partner gained from the joint venture. At the least, it raises the question whether the parties contemplated any other consequence of a negative capital account and justified the trial court's examination of extrinsic evidence of the parties' intent.

[6] Plaintiff alleged that she held notes from the partnership and was owed $67,222 plus interest on those notes. Defendants' first counterclaim alleged that, according to the rules of distribution set out in ORS 68.620, plaintiff's claim on the notes should be reduced by the amount of the negative capital balances. The trial court's declaratory judgment was limited to those two claims. All other claims were dismissed without prejudice.

owes her on the notes. To be sure, plaintiff did not get every-thing she sought; the trial court did not enter judgment on the notes. But the trial court did not err in determining that, on these facts, plaintiff was the prevailing party. *See Wilkes v. Zurlinden*, 328 Or 626, 632, 984 P2d 261 (1999); *Anderson v. Jensen Racing, Inc.*, 324 Or 570, 580, 931 P2d 763 (1997).[7]

■■    We turn to plaintiff's cross-appeal. Plaintiff argues that the trial court erred in concluding that she was not enti-tled to judgment on her notes until the final liquidation of WWDM and settlement of accounts among its partners. The general rule is that one partner cannot bring an action at law against another partner on a partnership obligation until there has been a partnership accounting. *See Troutman v. Erlandson*, 287 Or 187, 197-200, 598 P2d 1211 (1979). That rule also applies to an action by a partner against the part-nership. *See id.* at 199.

Plaintiff argues, however, that *Wilson v. Wilson*, 26 Or 251, 38 P 185 (1894), establishes an exception to that rule. In *Wilson*, one partner gave another partner a note that arose out of a partnership transaction. The court presumed that "the giving of the note is an isolation or separation of the par-ticular matter from the general partnership account" that would allow the partner holding the note to bring an action at law to enforce it. *Id.* at 258. The court recognized, however, that the other partner could bring a cross-bill in equity to show that the action on the note should be enjoined until there was a partnership accounting. *Id.* at 260-61. Stated in more modern terms, *Wilson* recognizes the possibility that one partner's note to another partner may be enforceable sep-arately although the facts of the transaction may demon-strate that enforcement of the note should be deferred until the partnership accounting.

---

[7] Defendants also argue that plaintiff is not entitled to attorney fees because she failed to allege that she was entitled to them under the joint venture agree-ment. Plaintiff, however, pleaded that she was entitled to recover attorney fees under the notes. The trial court entered a declaratory judgment in her favor on her note claim, and the efforts she expended in defeating defendants' first counterclaim were necessary to that success. Plaintiff could have also pleaded that she was enti-tled to fees under the joint venture agreement, but her allegation that she was enti-tled to fees under the notes was sufficient to support the trial court's fee award.

In this case, plaintiff is suing to enforce the joint venture's notes, not a note from one of its members. There is thus no reason to assume, as the court did in *Wilson*, that the subject of the notes is somehow separate or isolated from the joint venture's business. Moreover, the terms of the joint venture agreement make clear that the notes are inextricably bound up in that business. Paragraph 15 of the agreement provides an order of payment on liquidation under which the notes have third priority. The joint venture's substantial notes to Doman and Withers have the same priority. The agreement specifies that payment on those notes will be prorated if the joint venture lacks sufficient funds after paying off the obligations that have a higher priority. The trial court correctly recognized that any judgment on plaintiff's notes should wait until the final accounting.

Affirmed on appeal and cross-appeal.