Argued and submitted July 15, 2010, affirmed March 23, petition for review denied June 10, 2011 (350 Or 423)

John GILBERT;
Thomas K. Hatfield, Trustee of the
Hatfield Irrevocable Trust Sella Hatfield Interest;
Margaret S. Ivers; Ellen Leigh;
Donna Jensen Family, LLC; Diane L. Nikkila;
First Independent Bank, as Trustee for
William L. Seibel Exempt Qtip Trust;
First Independent Bank, as Trustee for
William L. Seibel Nonexempt Qtip Trust;
Julie L. Mayfield; William R. Hatfield;
Susan E. Hatfield; Anderson Living Trust;
and Robert Wood,
*Plaintiffs-Respondents,*

*v.*

MEC OREGON RACING, INC.,
an Oregon corporation;
and MEC Land Holdings (Oregon), LLC,
an Oregon limited liability company,
*Defendants-Appellants.*

Multnomah County Circuit Court
080202071; A141715

251 P3d 788

Richard L. Baum argued the cause for appellants. With him on the briefs were Rebecca Thiebes Gross and Roberts Kaplan LLP.

Eric S. Postma argued the cause for respondents. With him on the brief were Gary M. Bullock, Meredith Boyden, and Gary M. Bullock and Associates, P.C.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

LANDAU, J. pro tempore.

## LANDAU, J., pro tempore

At issue in this case is the construction of a contract that governs the fees that the operators of the Portland Meadows horse racing track must pay to the owners of the race track for wagering on horse races that are "simulcast" from other horse racing sites. The decades-old contract, which was executed before simulcasting of off-track races was permitted, describes two different fees: one that applies to "race meets" conducted during the "regular racing season" and another that applies at other times of the year. The dispute arises out of the fact that the simulcasting occurs at times that the operators are not licensed to run live horse races, although they possess a racing license for the entire calendar year. The operators argue that, because the simulcasting does not occur during the live horse racing season, the higher rates that apply to the "regular racing season" do not apply. The owners, on the other hand, argue that, because the simulcasting involves "race meets" during the time covered by the operators' racing license, the "regular racing season" rates do apply.

The dispute precipitated this action for breach of contract and for declaratory judgment. The parties filed cross-motions for summary judgment, each arguing that the contract unambiguously required one fee or the other. The trial court sided with the owners, concluding that the contract unambiguously requires the operators to pay the rate that applies to race meets during the regular racing season. The operators appeal, arguing that the trial court erred in concluding that the regular racing season rate applies. We affirm.

## I. FACTS

This appeal is but the latest in a series of cases concerning the payment provisions of the 1984 operating agreement; indeed, much of the argument in this case concerns the significance and proper interpretation of the prior cases. We therefore begin with a brief summary of the regulatory context in which the agreement was executed, follow that with a more detailed description of the prior cases, and then address the particular facts that gave rise to this most recent dispute.

## A.   *Regulatory context and earlier litigation*

The Oregon Racing Commission is delegated the authority to license, regulate, and supervise all "race meets" held in Oregon. ORS 462.270(1). A "race meet" is defined by statute as "any exhibition of animal racing where the mutuel system[1] is used in conjunction with any race." ORS 462.010(12). An operator must have a license from the commission to hold a race meet. ORS 462.020(1). The license must specify "the number of days the race meet shall continue and the number of races per day." ORS 462.040(4).

In 1984, plaintiffs (or their predecessors in interest), the owners of real property known as the Portland Meadows race track, entered into an agreement with Jensen Racing, Inc. (JRI), which was organized to operate races at Portland Meadows. The 1984 agreement included two provisions—sections 5 and 14—that defined how the operator was to pay fees to plaintiffs for the use of the race track. Section 5 of the agreement states:

> "5.   Use Fee. Operator shall pay to Owners, or their designated agent, each week of the *regular racing season* for the *race meet* conducted during that year, a fee for the use of the Race Track Facilities equal to one percent (1%) of the gross parimutuel wagering at the race track. This fee shall be paid weekly on a day to be selected by the parties."

(Emphasis added; underscoring in original.) By its terms, that section applied only to wagering on "race meets" that occurred during the "regular racing season." Section 14 then set out the rate that applied to other events:

> "14.   Use of Race Track Facilities for Special Purposes. Operator shall have the right to use the Race Track Facilities for special purposes other than conducting horse or animal racing. ('Special Purpose'). In such Special Purpose situations, however, the revenues, fees, or income ('Special Income'), if any, received by Operator from such activities or events shall be subject to payment of a Special

---

[1] " 'Mutuel' means a system whereby wagers with respect to the outcome of a race are placed with a wagering pool in which the participants are wagering with each other and not against the operator." ORS 462.010(8). "Mutuel" and "parimutuel" are used interchangeably in betting parlance.

Purpose fee by Operator to Owners, which shall be determined as follows:

"14.1. Horse Related Activities by Anyone. Operator shall pay to Owners a Special Purpose fee equal to one percent (1%) of the gross Special Income, but not including revenues from concessions, received by Operator for any Special Purpose use of the Race Track Facilities by anyone, including Operator, for all Special Purpose uses that are in anyway 'horse related' (e.g., horse shows, horse sales, etc.)."

(Underscoring in original.)

At the time the agreement was executed, Oregon law permitted wagering on live horse races only. It did not permit "simulcasting," that is, wagering on horse racing events that occurred at other locations but were broadcast to a permitted race track facility. JRI obtained racing licenses from the commission that authorized it to conduct live horse racing, generally from October through April, and the operator conducted live horse races in accordance with its licenses. It paid the owners for wagering on those live horse races pursuant to the provision in the operating agreement that governed wagering on "race meets" that occurred during the "regular racing season." Then, in the "off season," another operator, the Multnomah Kennel Club, ran live dog races under its own race meet license for that purpose.

In 1987, the Oregon legislature amended the law to authorize off-race-course mutuel wagering on races held at the licensee's race course, or on races held at race courses outside of Oregon. Or Laws 1987, ch 913, §§ 2-6. The commission, in turn, adopted administrative rules that permitted simulcasting, which it defines as "[l]ive audiovisual electronic signals emanating from a licensed race meeting and transmitted simultaneously with the running of the racing events at that meeting, and includes the transmission of pari-mutuel wagering odds, amounts wagered and payoff on such events, and other racing programming relating to the race animals or participants[.]" OAR 462-110-0010(86)(a) (2011). Simulcasting involving out-of-state races that are transmitted into a track in Oregon can be held only during

the period of time for which the commission has granted a race meet license. OAR 462-110-0010(18) (2011).

Following the change in the law, JRI began simulcasting at Portland Meadows races conducted live at other locations during the times for which the operator had a permit to conduct live horse race meets. In 1991, JRI assigned its interest in the agreement to New Portland Meadows, Inc. (NPM); NPM continued to conduct simulcast racing events during the season for which it, as JRI's successor, obtained a license to conduct race meets.

A dispute arose between JRI/NPM and the owners of Portland Meadows over which provision of the 1984 operating agreement governed payments to the owners for the use of the facilities to conduct the simulcast events. The owners argued that the higher rate set out in section 5—one percent of gross wagering—applied because the simulcast races were "race meets" conducted during the "regular racing season." The operators, on the other hand, argued that the lower rate set out in section 14—one percent of "special income," as defined in the agreement—applied because the simulcast races were not live horse races conducted at Portland Meadows.

In *Anderson v. Jensen Racing, Inc.*, 324 Or 570, 931 P2d 763 (1997) (*Anderson I*), the Supreme Court concluded that the simulcasting of off-track horse races during the regular racing season was subject to the fee provisions of section 5. The court characterized section 5 of the operating agreement as consisting of five different clauses, each one of which, it concluded, applies to simulcast racing. Because the court's analysis of section 5 is so central to the parties' arguments in this case, we set it out in detail:

> "Clause 1 ['Operator shall pay to Owners, or their designated agent'] describes the parties to the payment obligation. There is no dispute that it applies here.
>
> "Clause 2 is a self-contained temporal term, describing the overall period of time during which payments must be made. That is, payments must occur 'each week of the regular racing season for the race meet conducted during that year.' It is only in that temporal context that the term 'race meet' appears in paragraph 5. Clause 2, including its use of

the term 'race meet,' does not define the substantive nature of the payments or of the activities that generate the payment obligation, but only the period during which payments are due.

"Other portions of the agreement that use the term 'race meet' make clear that Clause 2 of paragraph 5 refers to the annual racing season during which the operator is licensed. * * * Those paragraphs require the operator of Portland Meadows to receive 'a race meet license' from the Oregon Racing Commission for each annual racing season. As noted, the parties agree that the simulcast races occur only during the annual season when the operator of Portland Meadows is licensed to conduct a 'race meet.' Accordingly, the condition of clause 2 of paragraph 5 is met.

"Clause 3 of paragraph 5 explains substantively what the payment is for: it is a fee for the use of the 'Race Track Facilities.' Betting on simulcast races by bettors located at Portland Meadows is, by its terms, a use of the Race Track Facilities * * *. Indeed, the parties agree that presenting simulcast races at Portland Meadows is a use of the Race Track Facilities. Clause 3 applies to simulcast racing.

"The next clause of paragraph 5, clause 4, states the amount to be paid: one percent of 'gross parimutuel wagering at the race track.' By contrast, paragraph 14 of the agreement establishes a different means of payment when the operator receives 'revenues, fees, or income' from an activity or event. There is no mention in paragraph 14 of parimutuel wagering. As noted, the parties agree that simulcast racing generates gross parimutuel wagering at the race track but does not generate other forms of revenues, fees, or income. We also note that clause 4 requires that the *gross parimutuel wagering* be 'at the race track,' but does not similarly require that the *race* be held at Portland Meadows. Because all the conditions therein are met, clause 4 of paragraph 5 applies.

"The final sentence of paragraph 5 of the agreement is clause 5. It states a detailed mechanism for the timing of each payment: weekly on a day of the parties' choosing. Clause 5 is consistent with the application of paragraph 5 to simulcast racing."

*Id.* at 576-78 (emphasis in original).

Meanwhile, as the litigation in *Anderson I* remained pending, the operators at Portland Meadows began conducting wagering on simulcast races during the operators' *off-season* under the Multnomah Kennel Club's race meet license. The operators paid the owners for wagering on simulcasts in the off-season under the payment terms of section 14. That led to another dispute between the owners and the operators. Once again, the owners argued that the payment provisions of section 5 applied, while the operators urged the application of section 14. Litigation ensued, leading to a trial court judgment declaring that the off-season simulcasts were subject to section 5.

In *Anderson v. Jensen Racing, Inc.*, 154 Or App 443, 958 P2d 906, *rev den*, 327 Or 553 (1998) (*Anderson II*), this court reversed. In a brief per curiam opinion, the court explained that, in *Anderson I*, the Supreme Court "ma[de] it clear that [section 5] refers to the annual racing season during which the operator is licensed." *Id.* at 444 (internal quotations omitted). Accordingly, we determined that the trial court erred in concluding that section 5 applied to the use of Portland Meadows as an off-track betting site during a time when the operators were not licensed. After *Anderson II*, section 5 applied to wagers on simulcasts during the operator's licensed season, while section 14 applied to wagers on simulcasts that occurred during the off-season under the Multnomah Kennel Club's race meet license.

B. *The current dispute*

Following this court's decision in *Anderson II*, defendants succeeded JRI and NPM as the operators at Portland Meadows. In 2005, the Multnomah Kennel Club stopped operating. Because defendants could not rely on the Multnomah Kennel Club's race meet license to conduct wagering on simulcast races during the off-season, as their predecessors had, they asked the commission to extend their license to the entire year. In response, the commission began issuing a year-round race meet license to defendants; each license, however, still restricted *live* horse race meets to a series of specified dates. In July 2005, for example, the commission issued a license to defendants "to conduct a race meet for the period July 1, 2005 through June 30, 2006," but then listed 80

specific dates on which live races could be conducted between late October 2005 and early May 2006. Similarly, in July 2006, the commission issued a license to defendants "to conduct a race meet for the period July 1, 2006 through June 30, 2007," followed by a list of specific dates on which live races could be held at the track, between early October 2006 and early May 2007. And, interestingly, in July 2007, the commission issued a license to defendants "for the period July 1, 2007 through September 30, 2008"—a 14-month period—followed by a list of specific dates on which live races could be conducted, between early October 2007 and mid March 2008.

The change in defendants' race meet license in 2005 led to the current dispute. Plaintiffs contended that, because defendants now have a license for the entire year, they should calculate their payments for pari-mutuel wagering on simulcast race meets throughout the year under section 5. Plaintiffs initiated this action for breach of contract, unjust enrichment, and declaratory judgment in accordance with that contention. Defendants responded by asserting that, under *Anderson II* and the wording of the operating agreement, section 5 applies only to wagering on horse races that occur during the "regular racing season," which, they contend, consists of the *live* horse races permitted on specified dates in their horse racing license. On cross-motions for summary judgment, the parties asserted their respective positions to the trial court, which ultimately sided with plaintiffs. The parties then stipulated to the amount of damages, but reserved the right to contest liability on this appeal.

## II.  ANALYSIS

On appeal, the question is whether section 5—which applies to pari-mutuel wagering on "race meets" conducted during the "regular racing season"—applies to wagering on simulcast horse races at times other than those for which defendants are authorized to conduct live horse races.

Defendants contend that, although simulcast horse races may, in a more general sense, be "race meets," they are not race meets that occur during the "regular racing season," and only wagering on race meets that take place during that "regular" racing season is subject to section 5's payment requirement. Defendants acknowledge that they possess a

horse racing license for the entire year. They nevertheless insist that, to avoid rendering the contractual term *"regular racing season"* superfluous, it must be taken to refer to something less than the entire licensing period. Under the circumstances, they contend, it is reasonable to construe the phrase to refer only to the part of the racing season for which *live* racing is authorized.

Plaintiffs respond that defendants' proposed construction of the operating agreement cannot be reconciled with the Supreme Court's decision in *Anderson I*, which held that section 5 applies to "the annual season when the operator of Portland Meadows is licensed to conduct a 'race meet.' " 324 Or at 577-78. In this case, plaintiffs observe, there is no dispute that the simulcast horse races are "race meets." It necessarily follows, they conclude, that the payment provisions of the operating agreement that apply to such race meets applies.

Defendants point out that at the time of *Anderson I* the "regular racing season" and the period of the "race meet" were coextensive; as a result, the court did not consider the meaning of "regular racing season" in its decision. Instead, they say that the current circumstances are controlled by *Anderson II*, in which we held that section 5 did not apply to the off-season. Now, because the regular racing season is no longer coextensive with the race meet license, defendants maintain that section 5 only applies to simulcasts held each week during the "regular racing season," even if the license to conduct race meets extends the entire year.

We generally construe the words of a contract as a matter of law. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). We do so by considering the disputed text in the context of the agreement as a whole, and where possible, we give effect to the agreement as a whole. ORS 42.230.

In this case, defendants' interpretation of section 5 to apply only during the "regular racing season"—that is, the *live* horse racing season—is, at least taken in isolation, a plausible construction of the phrase. The problem, however, is that their interpretation of the phrase cannot be reconciled with the balance of the agreement and, in particular, the

way in which the Oregon Supreme Court interpreted it in *Anderson I.*

Beginning with the wording of the operating agreement itself, we note that nothing in the agreement suggests that the "regular racing season" is limited to the season during which only *live* horse racing occurs. Rather, the phrasing of section 5 appears to assume that the "regular racing season" is simply the period during which "race meets" occur. The wording of the agreement draws no distinction between live race meets and other types of race meets.

Defendants' interpretation of the phrase "regular racing season" is somewhat difficult to square with the ordinary meaning of the term "regular." *See Webster's Third New Int'l Dictionary* 1913 (unabridged ed 2002) (defining "regular" as, among other things, "steady or uniform in course, practice, or occurrence * * * returning, recurring, or received at stated, fixed, or uniform intervals"). If, as defendants contend, the "regular" racing season refers to those dates on which live horse racing is authorized, that season is anything but regular; in fact, it is different every year. For example, the license issued in July 2005 authorizes live horse race meets on specified dates between October and May, while the 2007 permit authorizes such races to occur between October and March. In a related vein, it is perhaps worth observing that those licenses actually do not authorize live horse race meets during a season; rather, they authorize live horse race meets *on specified individual dates.*

Perhaps most important, defendants' proposed construction of the operating agreement fails to take into account the Supreme Court's decision in *Anderson I*, which held that section 5 applies to wagering on simulcast horse race meets. To be sure, at the time of the court's decision, defendants had not yet begun simulcasting horse races at times they were not authorized to conduct live horse race meets. But the court's rationale and its careful, clause-by-clause examination of the wording of section 5 is pertinent to the dispute in this case in at least two key respects.

First, in determining that section 5—as opposed to section 14—applies to pari-mutuel wagering on simulcast

horse race meets, the court compared the ways in which payments are calculated under each of the two sections. The court noted that, under section 5, the fee is expressed in terms of a percentage of "gross parimutuel wagering," while under section 14, the fee is levied on "revenues, fees, or income." The court observed that "simulcast racing generates gross parimutuel wagering at the race track but does not generate other forms of revenues, fees, or income." 324 Or at 577. Accordingly, the court reasoned, it makes sense to conclude that section 5 was intended to apply to simulcast horse race meets, because wagering on such meets produces precisely the means of payment to which that section refers.

The same reasoning applies in this case. Regardless of *when* simulcast horse race meets occur, the fact remains that what is generated is gross pari-mutuel wagering, precisely what is referred to in section 5, not section 14.

Second, the Supreme Court noted that the portion of section 5 that refers to payments that must occur "each week of the regular racing season for the race meet conducted during that year"—the specific clause at issue in this case—refers to "the annual season during which the operator is licensed" and, moreover, that the "season" refers to the period of time when "Portland Meadows is licensed to conduct a 'race meet.'" *Id.* at 576-77. Thus, the court in *Anderson I* confirmed what we have suggested is implicit in the wording of section 5, namely, that the "regular racing season" refers, not to live horse racing, but to any time during which "race meets" are permitted.

Defendants insist that to apply section 5 to its off-season simulcasting is at odds with this court's decision in *Anderson II.* That case, however, merely held that section 5 did not apply when the simulcasting of horse races occurred during a time for which there was no license to conduct horse races. As the Supreme Court held in *Anderson I*, section 5 applies during the period of time when defendants are licensed to conduct race meets. In this case—and in contrast to the facts in *Anderson II*—defendants are simulcasting horse races during a period of time when they *are* licensed to conduct race meets.

To summarize, the Supreme Court has concluded that section 5 of the operating agreement applies to pari-mutuel wagering on simulcast races. In doing so, the court placed particular emphasis on the period for which the operator is licensed, and that simulcasts generate payment in terms of gross pari-mutuel wagering. It is undisputed that defendants have a year-round race meet license under which it conducts simulcast races, and the language of the contract requires payment of a fee for the race meet conducted during the year. As such, section 5 applies to pari-mutuel wagering conducted at Portland Meadows during the period of defendants' race meet license.

Affirmed.