Argued and submitted September 1, 2015, affirmed March 15, 2017

WESTERN PROPERTY HOLDINGS, LLC,
an Oregon limited liability company,
*Plaintiff-Appellant,*

*v.*

AEQUITAS CAPITAL MANAGEMENT, INC.,
an Oregon corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
121114490;
A155841 (Control), A156875

392 P3d 770

Cody Hoesly argued the cause for appellant. With him on the briefs was Larkins Vacura LLP.

Robyn Ridler Aoyagi argued the cause for respondent. With her on the brief were Christopher J. Pallanch, Steven M. Wilker, and Tonkon Torp LLP.

Before Sercombe, Presiding Judge, and Ortega, Judge, and Tookey, Judge.

## SERCOMBE, P. J.

Plaintiff appeals a judgment for defendant, assigning error to the trial court's grant of defendant's motion for summary judgment. Defendant made a secured loan to a third party. Plaintiff agreed to pay defendant a portion of the loaned money, and defendant agreed to pay plaintiff its share of the loan repayment or any proceeds from a foreclosure sale of the collateral. Plaintiff claimed that defendant blocked a potential sale of the collateral that would have allowed plaintiff to recoup all of the money that it provided, and brought claims for breach of contract, breach of the implied duty of good faith and fair dealing, breach of duties under a special relationship, and negligence. On defendant's motion for summary judgment, the trial court concluded that there were no genuine issues of material fact precluding summary judgment and granted the motion. We affirm.[1]

On appeal from the grant of a motion for summary judgment, "we will affirm the trial court's judgment if we agree that 'there is no genuine issue as to any material fact and the moving party [was] entitled to a judgment as a matter of law.'" *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 460, 157 P3d 1272 (2007) (quoting *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001) (brackets in *O'Dee*)); *see also* ORCP 47 C. No issue of material fact exists if, viewing the evidence in the light most favorable to the nonmoving party—in this case, plaintiff—"'no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment.'" *O'Dee*, 212 Or App at 460 (quoting ORCP 47 C). We state the facts in accordance with that standard.

This dispute arose out of the merger of Catcher Holding, Inc. (Catcher) and Vivato Networks, Inc. (Vivato). Catcher was a public company that owned computer-related

---

[1] Plaintiff also appeals a supplemental judgment and assigns error to the award of attorney fees to defendant as prevailing party, contending that defendant should not have prevailed on summary judgment. Because we conclude that the trial court did not err in granting defendant's motion for summary judgment, we affirm the supplemental judgment.

assets, and Vivato was a company that owned intellectual property related to wireless technology. Defendant, Aequitas Capital Management, is an investment management company, and one of defendant's affiliates, Aequitas Investment Management (AIM), was part of a group of investors (the Catcher Note Holders) who loaned Catcher $4.8 million; AIM contributed $500,000 to that amount. In November 2007, Vivato sought defendant's assistance to raise new equity. Defendant and Vivato developed a plan to merge Vivato into Catcher as a wholly owned subsidiary and for Catcher to then sell its preferred stock in order to raise $8 million.

In order to provide interim financing prior to the completion of the merger, defendant agreed to loan Vivato $1 million. The loan was secured by Vivato's assets—primarily patents—which were transferred to a newly formed company called Vivato Holdings, Inc. (Vivato Holdings). The patents were valued at approximately $800,000. Vivato Holdings then granted defendant a security interest in the patents. After the merger, Vivato Holdings would remain a separate entity from Catcher, but it agreed to grant Catcher an exclusive license and an option to purchase the patents.

Additionally, to reduce the risk of default, defendant required Vivato's owners to have a personal financial stake in the loan. To that end, some of Vivato's shareholders formed plaintiff, a limited liability company, which then entered into a loan participation agreement (LPA) with defendant. Under the LPA, plaintiff agreed to contribute up to 30 percent of the funds loaned to Vivato, and defendant agreed to remit a proportionate share of any loan repayments by Vivato to plaintiff. Additionally, plaintiff would receive a proportionate share of any net proceeds from a sale of the collateral in the event of default.

On November 30, 2007, the Catcher-Vivato merger, the loan agreement, and the LPA became effective. Four days later, the agreement granting Catcher a license and option to purchase the patents went into effect. Catcher's interest in the patents under the license agreement was expressly made junior to defendant's security interest in the patents. From November 2007 to February 2008, defendant loaned Vivato $987,750, of which plaintiff contributed $287,750.

In early 2008, Vivato defaulted on the loan. It also became clear that Catcher's $8 million preferred stock offering would not be successful. Beginning in December 2007, Vivato Holdings had been negotiating a sale of the patents to a company called Intellectual Ventures (IV), which offered to purchase them for $1.8 million. If the sale was successful, the proceeds would be used to pay off the loan, with the remainder going to Catcher to support its operations while Catcher attempted to raise additional funds. At the end of February 2008, IV and Vivato Holdings executed a sales agreement.

Before IV would close on the deal, it required assurance that it would receive clear title to the patents. There were two encumberances on the title that needed to be removed before the deal could go through—defendant's security interest and Catcher's exclusive license and option to purchase. The security interest would be released when the sales proceeds were used to repay defendant for the outstanding balance of the loan. In an attempt to eliminate the license and option to purchase, on March 24, 2008, Catcher and Vivato Holdings amended the licensing agreement to eliminate the option to purchase and made Catcher's license nonexclusive. Vivato Holdings and IV renegotiated the price to $1.6 million, and they hoped that the sale could be completed by the end of April.

On April 1, 2008, Catcher stopped doing business and terminated all of its employees. Shortly thereafter, some of the Catcher Note Holders became concerned about the validity of the licensing agreement amendment and the advisability of selling the patents to IV. Those note holders demanded that defendant's affiliate, AIM, resign as collateral agent. The note holders asserted that AIM was acting in the interest of defendant and plaintiff to sell the patents and secure repayment for the Vivato loan, rather than acting in the interest of the Catcher Note Holders, who wanted Catcher to retain an interest in the patents.

AIM responded by writing a memorandum to the Catcher Note Holders on May 1, 2008. Although AIM contended that it had "at all times * * * acted appropriately, with full disclosure, and in the best interests of the Note Holders," it resigned as collateral agent, because its "objectivity ha[d]

been called into question." AIM then noted that the note holders had "concerns" about the sale of the patents to IV and the validity of the licensing agreement amendment. AIM explained that one of the effects of the amendment would be to remove the patents from the collateral that secured the note holders' note, and thereby place them "out of the reach of the Note Holders." It further explained that the consideration for the amendment was "unclear" and that it shared the note holders' "concerns" that the amendment "was not properly authorized and, for that and other reasons, should be rescinded." AIM urged the note holders to decide whether the sale to IV was in their best interest and stated that it had requested legal counsel to investigate "the rights of Catcher * * * to acquire" the patents and "the rights of Catcher * * * with regard to the proposed sale of the [patents] by Vivato Holdings to Intellectual Ventures, and, derivatively, the rights of the Note Holders under the Collateral Agreement with regard to the [patents] and any proceeds of the sale of the [patents]." It also pledged to comply with the decision of the majority of the note holders on all issues discussed in the memorandum.

At that point, IV remained interested in the patents, but it would not close until the issue with the licensing agreement amendment was resolved. The note holders, however, continued to challenge the validity of the amendment. Defendant hired a law firm to attempt to negotiate a settlement between the note holders and Vivato Holdings and to initiate judicial proceedings to foreclose on the patents. Defendant filed a foreclosure action in Oregon Federal District Court on June 20, 2008.

The foreclosure proceedings dragged on for more than a year.[2] Ultimately, defendant successfully obtained

---

[2] Defendant did not include Catcher as a party to the action, and, instead, Vivato Holdings added Catcher as a third-party defendant when it filed counter- and cross-claims. Additionally, the "Vivato Holdings" that defendant filed the action against was the wrong entity. The parties litigated to the point of a stipulated judgment in federal court with a Delaware corporation named "Vivato Holdings" as defendant. They then discovered that the patents were actually owned by another entity, also called "Vivato Holdings," which was an Oregon corporation. Because the presence of the Oregon Vivato Holdings would destroy federal diversity of citizenship jurisdiction, defendant dismissed the action and refiled in Oregon Circuit Court.

a judgment of foreclosure on April 29, 2009, and then, on June 2, 2009, obtained clear title to the patents at a sheriff's sale. By that point, IV had lost interest in purchasing the patents, stating in March 2009 that they "no longer met its qualifications." Thereafter, defendant sold the patents to a different company, XR Communications, for $800,000.

Defendant did not promptly inform plaintiff of the sale to XR Communications and transfer to plaintiff its share of the proceeds. When plaintiff learned of the sale, it filed this action, raising claims of breach of contract, breach of the implied duty of good faith and fair dealing, breach of duties under a special relationship, and negligence. After plaintiff filed the action, defendant paid plaintiff $220,481.60, which defendant had calculated as plaintiff's share of the proceeds of the XR Communications sale plus interest to account for the delay in payment.

After accepting that payment, plaintiff filed a motion for leave to amend its complaint, which the court granted. Plaintiff raised the same four claims. In plaintiff's first claim, it alleged that defendant had breached the LPA by failing to pay its full share of the proceeds from the XR Communications sale and by blocking the sale to IV, which would have resulted in a better price for the patents. According to plaintiff, defendant, acting through its affiliate, AIM, caused the note holders to oppose the licensing amendment and thereby scuttled the IV sale. In plaintiff's second claim, largely a reiteration of the first claim for breach of contract, plaintiff argued that defendant breached its contractual duty of good faith and fair dealing by interfering with the IV sale. In plaintiff's third claim, it alleged that defendant and plaintiff were in a "special relationship," in which defendant owed plaintiff heightened duties of loyalty and fair dealing, because the LPA gave defendant "complete control over the enforcement of the terms of the Loan * * * and expressly provided that Collateral and funds received and held by [defendant] as payment on the Loan were to be held by it as agent for [plaintiff]." Plaintiff asserted that defendant had breached those "heightened duties" because it had engaged in self-dealing by acting to "block" the IV sale to benefit the Catcher Note Holders. Finally, plaintiff asserted that defendant was negligent

because it breached an "express duty of reasonable care" imposed by the LPA.

Defendant then filed a motion for summary judgment, contending that plaintiff had failed to raise any genuine issue of material fact and that defendant was entitled to judgment as a matter of law. With respect to plaintiff's first claim for relief, defendant asserted that it had paid plaintiff in full under the LPA, and therefore had not breached any contractual obligations to plaintiff. Regarding the second claim, defendant argued that it did not breach its duty of good faith and fair dealing, because it had merely exercised its express contractual right to foreclose upon Vivato's default. In response to plaintiff's third claim, defendant argued that there was no "special relationship" between the parties, because the terms of the LPA expressly disclaimed any such relationship. Finally, defendant argued that plaintiff's negligence claim was barred by the "economic loss rule."

Plaintiff responded in a written opposition to defendant's motion that there were factual issues remaining with respect to three of its claims. First, it contended that defendant had improperly calculated defendant's share of the proceeds of the IV sale and still owed plaintiff money. Second, plaintiff argued that defendant's contractual right to foreclose was limited by the duty of good faith and fair dealing and there were issues of fact as to whether defendant had exercised its discretion for an improper purpose by foreclosing instead of assisting with the IV sale. Third, plaintiff asserted that there were unresolved factual issues about whether defendant had breached its duties under a special relationship, because, according to plaintiff, such a relationship arose when plaintiff gave defendant control of the loan and the authority to exercise independent judgment in servicing the loan. Plaintiff did not address its negligence claim in its written opposition to defendant's motion.

At the hearing on defendant's motion for summary judgment, the parties and the trial court primarily focused on whether there was any factual support in the record for plaintiff's theory that defendant had caused plaintiff's damages by "blocking" the IV sale. Plaintiff again advanced no

argument on its negligence claim. Following that hearing, the trial court granted defendant's motion for summary judgment with respect to all of plaintiff's claims and entered a general judgment to that effect.

On appeal, plaintiff argues that the trial court erred in granting summary judgment on each of its claims, reviving its theory that defendant should be held liable for its efforts to "block" the sale of the patents to IV. We write primarily to address plaintiff's claims for breach of the implied duty of good faith and fair dealing and for breach of duties under a special relationship.[3]

With respect to its contractual good faith and fair dealing claim, plaintiff argues that defendant had a duty under the LPA to facilitate the sale to IV instead of foreclosing on its security interest in the patents. According to plaintiff, there are genuine issues of fact about whether the foreclosure was necessary or whether it could have been avoided if defendant had acted through its affiliate—AIM— to dissuade the note holders from objecting to the licensing amendment. Plaintiff also asserts that factual issues remain as to whether defendant acted in bad faith because it was motivated by a desire to benefit AIM, as a Catcher Note Holder, at plaintiff's expense. Defendant responds that, as a matter of law, it did not breach the duty of good faith and fair dealing by choosing to remedy Vivato's default through foreclosure, because the LPA expressly empowered it to foreclose upon default and the duty of good faith and fair dealing imposed no obligation to pursue the IV sale as an alternative. We agree with defendant.

Every contract includes an implied duty of good faith and fair dealing, which "serves to effectuate the objectively reasonable expectations of the parties." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 615, 892 P2d 683 (1995).[4]

---

[3] As we further explain below, our reasoning on those claims dispenses with plaintiff's arguments on its breach of contract and negligence claims.

[4] We note that the LPA might have been governed by Article 9 of the Uniform Commercial Code (UCC). *Cf. Asset Restructuring Fund, L.P. v. Liberty Nat. Bank and Resolution Trust Corp.*, 886 SW2d 548, 551-53 (Tex App 1994) (surveying authority and concluding that a loan participation agreement gives the participant a security interest in the collateral for the underlying loan); ORS 79.0109(1)(a) (Article 9 of the Uniform Commercial Code applies to "[a] transaction, regardless

However, that duty cannot "be construed in a way that changes or inserts terms into a contract. Instead, [t]he law imposes a duty of good faith and fair dealing in contracts to facilitate performance and enforcement in a manner that is consistent with the terms of the contract." *Safeco Ins. Co. v. Masood*, 264 Or App 173, 178, 330 P3d 61, *rev den*, 356 Or 638 (2014) (brackets in original; internal quotation marks omitted); *see also Gibson v. Douglas County*, 197 Or App 204, 217, 106 P3d 151 (2005) (explaining that the duty of good faith and fair dealing "cannot expand the parties' substantive duties under a contract, rather it relates to the performance of the contract"). Furthermore, the reasonable contractual expectations of the parties are shown by the express terms of the contract. *Pacific First Bank v. New Morgan Park Corp.*, 319 Or 342, 353-54, 876 P2d 761 (1994). Put another way, a party never violates the duty of good faith and fair dealing by "invoking its express, written contractual right." *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 645, 891 P2d 639 (1995).

To resolve this claim, then, we must first determine the scope of defendant's rights under the LPA in the event of a default by Vivato. In doing so, we employ the general principles of contract interpretation. *Pacific First Bank*, 319 Or at 347. In interpreting a contract, we "look first to the language of the instrument itself and consider its text in the context of the document as a whole." *Miller v. Jones*, 256 Or App 392, 397, 302 P3d 812 (2013) (internal quotation marks omitted). "Furthermore, we are mindful that, '[i]n construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting.'" *Id.* (quoting ORS 42.220).

---

of its form, that creates a security interest in personal property or fixtures by contract"). If that is the case, then the UCC duty of good faith would displace the common-law duty of good faith and fair dealing, and different standards would apply. *See U.S. National Bank v. Boge*, 311 Or 550, 564-66, 814 P2d 1082 (1991). However, both parties assumed, in the trial court proceedings and on appeal, that the common law duty applies in this case. Further, no Oregon court has decided whether loan participation agreements are governed by the UCC. Therefore, for the purpose of resolving this case, we assume that the common law duty of good faith and fair dealing applies.

Plaintiff argues that the duty of good faith and fair dealing required defendant to avoid foreclosure and facilitate the sale to IV in order to satisfy its reasonable contractual expectations for defendant's performance of the following provisions of the LPA:

"6.1 <u>Enforcement.</u>

"(a) Originator [defendant] shall have full and complete authority to enforce the provisions of the Loan Documents. Originator shall consult with Participant [plaintiff] as it shall deem advisable in light of the community of interests represented by the joint participation in the Loan. *Originator shall, in the exercise of its reasonable business judgment and in light of all circumstances surrounding the Loan, have full and complete authority to pursue any remedy or remedies available for enforcement of the Loan Documents*; provided, however, that Originator may not make any material amendment to the Loan Documents, forgive or waive any principal or interest, or release any collateral or obligor on the Loan without the prior written consent of Participant. All costs and expenses actually incurred by the parties hereto in enforcing, arising out of, or relating to, the Loan Documents, including, without limitation, the foreclosure of any security interest, or defense of any claim or counterclaim, shall to the extent the same are not actually reimbursed to the party advancing the same, be allocated between the parties hereto in the same proportion as their respective Participation Interests.

"(b) If Originator is unable to collect the Loan after *reasonable efforts* to do so, Originator shall give prompt notice thereof to Participant and shall commence foreclosure by appropriate procedure all as reasonably determined by Originator. Originator, after consultation with Participant, may determine whether to purchase any of the collateral at any foreclosure sale or to accept a deed-in-lieu of foreclosure and shall manage and maintain the collateral if so acquired in accordance with Section 7.3 below.

"* * * * *

"8.1 <u>Servicing Control.</u> Subject to Sections 6 and 7, Originator shall have authority for servicing and administering the Loan in all respects. *Originator shall be responsible for servicing and administering the Loan in accordance with prudent lending procedures for loans of a*

*similar type.* Originator shall approve and disapprove all requests for disbursements in accordance with its normal banking procedures for similar loans. Participant shall not be responsible for any payment to Originator for the costs of servicing the Loan, including the processing of requests for disbursement of the proceeds of the Loan under periodic draw requests permitted under the Loan Documents."

(Underscoring in original; emphases added.)

We interpret those provisions in the context of the contract as a whole. At the highest level, the contract governs the relationship between plaintiff and defendant with respect to the Vivato loan. Neither the terms of the loan itself, nor the enforcement of the loan, are directly governed by the LPA. Rather, the LPA defines the rights and duties of plaintiff and defendant as participants in the loan. For example, LPA section 4.1 provides for the method for transferring plaintiff's share of the loan disbursements to defendant, which in turn transfers those funds to Vivato; LPA section 4.3 states the procedure for distributing to plaintiff its share of any principal and interest payments collected from Vivato; and LPA section 6.1(a) provides for the division of costs between plaintiff and defendant in the event of foreclosure.

The first two sections relied on by plaintiff, LPA sections 6.1(a) and (b), appear under the heading "Enforcement." In line with the larger purpose of the LPA, those sections do not concern the "enforcement" of the terms of the LPA itself, but rather the enforcement of defendant's remedies against Vivato, the borrower in the underlying loan. Section 6.1(a) pertains to "Originator's" (defendant's) authority to enforce its remedies under the "Loan Documents," which are defined by section 1.5 as the documents creating defendant's relationship with Vivato, including the "Business Loan Agreement," promissory note, commercial security agreement, and any other agreements or instruments made between defendant and Vivato. And, section 6.1(b) deals explicitly with one of the remedies that defendant may exercise against Vivato—foreclosure.

Thus, sections 6.1(a) and (b) govern the parties' obligations to one another and the contractual rights that they

may exercise with respect to defendant's enforcement of its remedies against Vivato. To that end, section 6.1(a) consigns certain decisions to defendant's discretion: Section 6.1(a) gives defendant "full and complete authority" to enforce the loan documents, and the "full and complete authority" to "pursue any remedy or remedies" for enforcement "in the exercise of its reasonable business judgment and in light of all circumstances surrounding the loan[.]" Section 6.1(a) then limits defendant's authority to modify the loan documents between defendant and Vivato by requiring defendant to obtain plaintiff's "prior written consent" before making any "material amendment to Loan Documents, forgiv[ing] or waiv[ing] any principal or interest, or releas[ing] any collateral or obligor on the Loan."

Sections 6.1(a) and 6.1(b) also compel defendant to take certain actions in enforcing its remedies. Defendant, generally, must "consult with [plaintiff]" whenever defendant deems it "advisable" to do so, and, specifically, before defendant either decides to accept a deed in lieu of foreclosure or to purchase the collateral at a foreclosure sale. Further, section 6.1(b) requires defendant to give "prompt notice" to plaintiff before commencing a foreclosure proceeding. And, importantly, section 6.1(b) obligates defendant to foreclose "[i]f [defendant] is unable to collect the Loan after reasonable efforts to do so[.]" Section 6.1(b) only obligates defendant to "manage and maintain the collateral" if the collateral is "acquired in accordance with Section 7.3." Section 7.3 pertains to the acquisition of the collateral by foreclosure sale or a deed-in-lieu of foreclosure.

The other section of the LPA highlighted by plaintiff, section 8.1, relates to defendant's "servicing control" of the loan. It explains that defendant has "authority for servicing and administering the Loan in all respects," except as "subject to Sections 6 and 7" of the LPA. It then mandates that defendant "shall be responsible for servicing and administering the Loan in accordance with prudent lending procedures for loans of a similar type" and that defendant "shall approve and disapprove all requests for disbursements in accordance with its normal banking procedures for similar loans." Finally, section 8.1 also provides that plaintiff is not liable for any "costs of servicing the Loan[.]"

Thus, section 6.1 of the LPA permits defendant to determine, "in the exercise of its reasonable business judgment and in light of all circumstances surrounding the Loan" whether it has made "reasonable efforts" to collect the loan under the loan documents. Then, if defendant determines that it has made reasonable efforts and that those efforts have failed to collect the loan, it "shall commence foreclosure" on the collateral. Defendant may make that decision without collaboration from plaintiff; its only obligation to plaintiff is to provide "prompt notice" of the foreclosure proceedings. The LPA creates no obligation by defendant to plaintiff with respect to modifying the loan documents—including a modification to sell the collateral to a third party—except to obtain plaintiff's consent for any modification.

Accordingly, the terms of the LPA gave defendant the express right to determine whether it was appropriate to foreclose upon a default by Vivato or whether other remedies for enforcement of the loan documents should be pursued. Therefore, plaintiff could not reasonably expect that defendant would account for plaintiff's interests or preferences in deciding whether to foreclose. *See Uptown Heights Associates*, 320 Or at 648 (concluding that the duty of good faith and fair dealing was irrelevant where "'the parties agreed to—that is, reasonably expected—a unilateral, unrestricted exercise of discretion' in [the defendant's] choice of foreclosure as a remedy should [the plaintiff] breach the contract by failing to make its mortgage payments" (quoting *Pacific First Bank*, 319 Or at 354)).

Further, the LPA did not include any duty on the part of defendant to consider modifications to the loan documents in lieu of pursuing the contractual remedies set out in the loan documents, including a duty to amend the documents by selling the collateral to IV. That duty cannot be implied by the duty of good faith and fair dealing. As discussed above, the duty of good faith and fair dealing relates to the performance of the terms of a contract; it cannot expand the duties owed by the parties beyond those already provided by the contract. *Gibson*, 197 Or App at 217. The LPA governs only the relationship between defendant and plaintiff. The relevant portions of the agreement define the parties' rights and their duties to one another with respect

to defendant's enforcement of its remedies against Vivato under the separate Business Loan Agreement and associated documents. A requirement that defendant or its affiliate, AIM, assist with the sale from Vivato Holdings to IV—either by pushing the Catcher Note Holders to drop their challenge to the amended licensing agreement or by some other means—would not relate to the performance of any duty that defendant owes to plaintiff under the LPA. It is entirely outside the scope of the agreement.

The only duties that defendant owes to plaintiff under the LPA in executing its remedies under the loan documents are to "consult" with plaintiff, provide "prompt notice" before foreclosing, and to obtain plaintiff's "prior written consent" before modifying the loan documents. It would therefore improperly expand defendant's contractual duties and effectively insert a new term into the agreement to conclude that the LPA contains an implied duty to assist the debtor in selling the collateral to IV.[5]

Accordingly, as a matter of law, plaintiff could not have had a reasonable expectation that defendant would act—either on its own or through AIM—to facilitate a sale of the patents instead of foreclosing on the loan. Therefore, no reasonable trier of fact could conclude that defendant violated the duty of good faith and fair dealing, and the trial court did not err in granting defendant's motion for summary judgment on plaintiff's claim for breach of the duty of good faith and fair dealing.[6]

---

[5] Further, nothing in section 8.1 undermines that conclusion. First, unlike sections 6.1(a) and (b), section 8.1 does not relate directly to the enforcement of defendant's remedies against Vivato. Rather, it deals broadly with "servicing and administering" the loan and particularly with standards for defendant's "approv[al]" or "disapprov[al]" of requests for disbursements, and its responsibility for fees associated with processing disbursement and periodic draw requests. There is nothing to suggest that section 8.1 imposes any obligations on defendant in the enforcement of its remedies that are not already provided for in sections 6.1(a) and (b), which deal specifically with enforcement. Second, to the extent the section pertains to the enforcement of the loan, it provides only that defendant must service and administer the loan "in accordance with prudent lending procedures for loans of a similar type." There is no reason why a lender would be imprudent for foreclosing upon a borrower's default.

[6] That conclusion obviates any need for further discussion of plaintiff's remaining breach of contract claim, which essentially reiterates the breach of the duty of good faith and fair dealing claim. We have concluded that defendant did

We next consider plaintiff's third claim for relief in tort, breach of duties under a special relationship. According to plaintiff, defendant owed it a duty of loyalty because defendant agreed to exercise its independent judgment in servicing the loan, creating a "special relationship" with plaintiff. Plaintiff further contends that genuine issues of fact remain as to whether defendant breached its duty of loyalty by acting against plaintiff's interests and "blocking" the sale of the patents to IV. Defendant responds that it owed plaintiff no such duty because the LPA expressly disclaims the existence of any fiduciary or agency relationship, except in limited circumstances that do not apply here.

Parties to a contract are typically restricted to asserting contractual remedies against one another, unless the parties are in a "special relationship," in which one party owes the other heightened duties of care or loyalty that can be enforced in tort. *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 106, 831 P2d 7 (1992). If a special relationship exists between the contracting parties, then a plaintiff can recover for losses caused by the defendant's breach of the heightened duties created by that relationship. *Id.* In *Bell v. PERB*, 239 Or App 239, 249-50, 247 P3d 319 (2010), *rev den*, 350 Or 230 (2011), we identified the four traits that define a "special relationship":

> "(1) One party relinquishes control over matters, usually financial, and entrusts them to the other party, *Conway* [ *v. Pacific University*], 324 Or [231,] 240-41[, 924 P2d 818 (1996)]; (2) [t]he party with control is authorized to exercise independent judgment; (3) in order to further the other party's interests; and (4) [t]he relationship either is, or resembles, other relationships 'in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship,' *Onita* [*Pacific Corp. v. Trustees of Bronson*], 315 Or [149,] 160[, 843 P2d 890 (1992)]."

The LPA does not create a special relationship between the parties. First, plaintiff did not "relinquish control" over certain matters and entrust that control to defendant. Plaintiff was not a party to the loan documents and

---

not have an express or implied contractual duty to avoid foreclosure and facilitate the sale. It therefore did not breach the contract.

therefore had no control over their implementation to relinquish. Thus, defendant had exclusive control over servicing the loan and foreclosing the security interest. The only thing that plaintiff relinquished was its investment. Next, defendant was not required to exercise any independent judgment in order to further plaintiff's interest with the respect to the enforcement of its remedies against Vivato. The LPA did not constrain defendant's choice of remedy under the loan documents to one that particularly benefitted plaintiff and not defendant.

Finally, the relationship of a loan participant to the lender is not one that bears any resemblance to relationships in which the law imposes a duty on the parties "to conduct themselves reasonably, so as to protect the other parties to the relationship." *Id.* (internal quotation marks omitted). Those include relationships where a client seeks the services of a professional and relies on the professional's independent and professional expertise. *Onita Pacific Corp.*, 315 Or at 160-61. They also include principal-agent relationships, or other similar relationships, where one party agrees to act in the other's behalf. *Id.*

Here, plaintiff did not rely on defendant's judgment in deciding whether to participate in the loan; instead, under LPA section 10.1,[7] plaintiff relied on its own "independent judgment" in making that decision. Moreover, under LPA section 10.2(b)(i), plaintiff warranted that it had sufficient "knowledge and experience" to evaluate the merits and assume the risk of the loan. Further, under section 10.2(b)(ii), plaintiff warranted that it chose to participate in the loan based on its own review of "materials and information

---

[7] Section 10.1 of the LPA provides:

"Originator does not assume and shall not have any liability to Participant for repayment of the Loan or the recovery of any sums advanced by Participant or interest thereon. * * * Originator does not assume and shall have no responsibility or liability, express or implied, for the collectability of the Loan, the Note, or any other Loan Document, or the financial condition of Borrower or any of the Debtors, or any credit or other information furnished by Originator to Participant. Participant acknowledges that the decision to participate in the Loan was made on the basis of independent judgment based on an informed independent analysis of the Collateral and the financial condition of Borrower and all Debtors. Participant is not relying on Originator or on any other information prepared by or on behalf of Originator and given directly or indirectly to Participant to assist Participant in making its decision."

with respect to [Vivato] and the Loan," and made its decision to participate "based solely on its own independent evaluation of the Loan and Borrower's creditworthiness." Moreover, although defendant was responsible for collecting payments from Vivato and enforcing its contractual remedies against Vivato, it did so for its and plaintiff's mutual benefit, rather than as an agent in plaintiff's behalf. Thus, the parties' relationship did not closely resemble a principal-agent relationship.

Plaintiff might be correct that the contract's disclaimer of any "fiduciary," "partnership," "joint venture," or "agen[cy]" relationship would not necessarily control if the circumstances indicated that the parties had, in fact, created such a relationship.[8] *See Viado v. Domino's Pizza, LLC,* 230 Or App 531, 534, 544, 217 P3d 199 (2009), *rev den,* 347 Or 608 (2010) (agency relationship existed between franchisor and franchisee, despite disclaimer of such a relationship in their contract); *Strader v. Grange Mutual Ins. Co.,* 179 Or App 329, 334, 39 P3d 903, *rev den,* 334 Or 190 (2002) ("[T]he crucial aspect of the relationship is not its name, but the roles that the parties assume * * *."). But where, as here, the circumstances of the relationship indicate that there was no special relationship, those provisions reinforce our conclusion to that effect. Accordingly, as a matter of law, plaintiff and defendant were not in a "special relationship" regarding the sale of the collateral or the servicing of the loan that imposed heightened duties on defendant. Therefore, no objectively reasonable factfinder could return a verdict in plaintiff's favor on its claim for breach of duties under a special relationship.[9]

---

[8] LPA section 13 provides that "[i]t is agreed that Originator and Participant are not in a fiduciary relationship, are not partners or joint venturers, and that Originator is not to act as agent for Participant except as specifically provided herein, but Originator is to act in all matters hereunder for Participant as an independent contractor."

[9] Even assuming that plaintiff's opposition to defendant's summary judgment motion on the negligence claim is preserved—a questionable assertion due to plaintiff's failure to include any discussion of that claim in its response to defendant's motion for summary judgment or to offer any argument on the claim at the summary judgment hearing—it fails for those same reasons. Under the "economic loss rule," a plaintiff in negligence cannot prevail on a claim for purely economic losses against the defendant, as is the case here, unless the plaintiff shows that the defendant owed it "some duty * * * beyond the common law duty to exercise reasonable care to prevent foreseeable harm." *Oregon Steel Mills, Inc. v.*

In sum, we conclude that all of plaintiff's claims fail as a matter of law and no genuine issues of material fact precluded summary judgment in defendant's favor. Accordingly, the trial court did not err in granting defendant's motion for summary judgment. For the same reasons, the trial court did not err in awarding attorney fees to defendant in the supplemental judgment.

Affirmed.

---

*Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004) (internal quotation marks omitted). Plaintiff asserts that defendant owed it that type of duty as a result of a "special relationship" between the parties. Because we have concluded that no special relationship existed, plaintiff's negligence claim fails as a matter of law.